# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Turman*, 2011 IL App (1st) 091019

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DONNELL TURMAN, Defendant-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-09-1019 |
| Filed | June 30, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for criminal sexual assault arising from an incident that occurred after he assisted in taking the intoxicated victim from a party to her apartment was reversed and the cause was remanded for a new trial, since plain error occurred when the instruction that the term "reasonable doubt" was for the jury to define allowed the jury to use a standard that likely would be below the threshold of the reasonable doubt standard, and, furthermore, the failure to instruct the jury that it could consider whether defendant made prior inconsistent statements to the police was error where defendant denied that his statement to the police was reread to him and the police statement used words, including "inebriated," that he claimed he would not have used or understood. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07-CR-5693; the Hon. Mary Margaret Brosnahan, Judge, presiding. |
| Judgment | Reversed and remanded for a new trial. |

Counsel on Appeal

Michael J. Pelletier, Alan D. Goldberg, and Jonathan Yeasting, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg and Jon Walters, Assistant State's Attorneys, of counsel), for the People.

Panel

PRESIDING JUSTICE CUNNINGHAM delivered the judgment of the court, with opinion.

Justices Connors and Harris concurred in the judgment and opinion.

## OPINION

¶ 1    In April 2009 the defendant, Donnell Turman, was convicted by a jury in the circuit court of Cook County of the Class 1 felony offense of criminal sexual assault. This offense required a finding that, while committing an act of sexual penetration, the defendant knew that the victim was unable to give knowing consent. 720 ILCS 5/12–13(a)(2) (West 2008). The trial court sentenced the defendant to five years of imprisonment. 730 ILCS 5/5–8–1(a)(4) (West 2008). The written sentencing order is devoid of any mention of a period of mandatory supervised release (MSR). The defendant filed a timely appeal of his conviction and sentence.

¶ 2    On appeal, the defendant raises the following issues: (1) whether the trial court violated his right to due process and a fair trial when it instructed the jurors that the term "reasonable doubt" was for them to define; (2) whether his right to a fair trial was denied because the trial court failed to instruct the jury that it could consider whether or not the defendant made prior inconsistent statements to the police; (3) whether the State failed to prove beyond a reasonable doubt that the defendant knew the victim could not give knowing consent to sex; (4) whether the trial court abused its discretion because it did not allow defense counsel to disclose to the jury, either in defense counsel's opening statement or during trial, the statements that the defendant made to police until after the State had introduced the statements into evidence; (5) whether the defendant is entitled to a new trial because the trial court violated Illinois Supreme Court Rule 431(b) (Ill. S. Ct. R. 431(b) (eff. May 1, 2007)); and (6) whether the cause should be remanded to allow the trial court to impose a definite term of MSR.

¶ 3    For the following reasons, we reverse the defendant's conviction and remand the case to the trial court for a new trial.

## BACKGROUND

¶ 5    The testimony at trial showed that on February 2, 2007, at approximately 11 or 11:30

p.m., the 17-year-old defendant and his 20-year-old brother, Jamol Turman (Jamol), arrived at a party in downtown Chicago. The victim, B.W., was 19 years old and also attended the party with David Nelson (Nelson), her friend and college classmate. Letasha Drake (Drake) testified for the State as follows. At the party she observed B.W. "drinking a lot, a lot of vodka, excessively." Drake and the victim were drinking straight vodka in eight-ounce cups. At one point during the party, Drake entered the bathroom and found B.W. passed out and lying across the toilet. Drake asked for help removing B.W. from the toilet. The defendant and Drake picked B.W. up and placed her in the bathtub. Drake described B.W. as being "lethargic. Her mouth was wide open. Her eyes were rolling back. She was moaning, making really disturbing noises." After leaving the bathroom, Drake returned to the party and asked if anyone would help B.W. The defendant answered affirmatively and went into the bathroom and closed the door. Drake saw B.W. approximately one hour later and B.W.'s eyes were "still kind of rolled back. All you could see was the white in her eyes." Drake stated during cross-examination that B.W. was drinking voluntarily and that she never saw her being forced to drink.

¶ 6        David Nelson testified for the State as follows. B.W. was very drunk at the party. He and the defendant helped B.W. to the bathroom, where he witnessed her vomiting. Nelson brought B.W. water and she vomited it up. The defendant stayed in the bathroom to help B.W., and then later Nelson saw B.W. "[p]assed out. She was just like her eyes were closed. She was sitting there. She would moan and that's really it."

¶ 7        Nelson left the party between 2 a.m. and 3 a.m. with the defendant, Jamol and B.W. in Jamol's car. Jamol drove to the apartment building where Nelson and B.W. lived. The defendant was in the backseat with B.W., who "started shaking like seizurely [*sic*] shaking and spitting up and moaning." The defendant's reaction to B.W.'s behavior was "[h]oly crap, what's going on." The defendant "did most of the carrying this time to take [B.W.] upstairs" to her apartment. Nelson stated he used his own key card to enter the building and reached into B.W.'s purse to get her apartment key.

¶ 8        Once they were in B.W.'s apartment, the defendant and Nelson placed B.W. on her bed. Nelson described B.W. as "passed out." Nelson and Jamol left the building and later returned to Nelson's apartment. At approximately 5 a.m., Nelson was awakened by Jamol and they went to B.W.'s apartment. B.W. was "flat out cold, out cold." The defendant and B.W. were in B.W.'s bed, and the defendant's head was near B.W.'s feet, with his feet near B.W.'s head.

¶ 9        Nelson did not see B.W. again until approximately 4 to 5 p.m. that same day. B.W. showed Nelson a note that the defendant had left in her bra. The note contained the defendant's phone number asking B.W. to call him. The note also contained the following:

> "What up baby, this is D-money AKA Donnell Jamol brother. OK even though you have a boyfriend thats cool, well my fault your getting married soon. but anyway even though you were drunk thats the reason you were acting the way you were acting I mean I actually had to pick you up and put you in my car and take you home and someone had to stay with you especially the way you were spitting up on the way home and when we first got here don't get me wrong it was just the alcohol but don't

trip we were both drunk as hell we both still had some very interesting sex and to be honest you kept on asking me but I kept saying no but you kept saying yes but for the record it was just the alcohol but the only thing is we both would have to keep our mouths closed.

P.S I still would like to talk to you on the low key excuse the hand writing Thank you for the Best night of D-moneys life."

Nelson took B.W. to the hospital, where she was examined and a sexual assault evidence collection kit was prepared.

¶ 10    The record discloses that the emergency room nurse found that B.W. had some tenderness in the upper part of her chest and a bruise on her left lateral thigh. A forensic scientist testified at trial that the vaginal and rectal swabs obtained from B.W. contained the DNA profiles of both B.W. and the defendant.

¶ 11    The defendant was arrested at approximately noon on February 19, 2007. Assistant State's Attorney Meg O'Sullivan spoke with the defendant at police headquarters. She memorialized the conversation in a written statement taken at 4 a.m. on February 20. O'Sullivan reviewed the same statement with the defendant and he signed each page. The defendant's name, as well as other names, is misspelled several times in the document.

¶ 12    The defendant's written statement can be summarized as follows. When the defendant met B.W. at the party she was already drunk and she became more intoxicated while drinking vodka. B.W. began to vomit in the bathroom and he and Nelson placed B.W. in the bathtub. The defendant helped move B.W. onto the couch where she passed out. The defendant and Nelson carried B.W. to the car and the defendant drove to B.W.'s apartment building. Nelson asked the defendant to stay with B.W. because of her condition and told the defendant not to have sex with her. The defendant drank some cognac and then fell asleep on B.W.'s roommate's bed. While acting like a zombie, B.W. took off her pants and top and climbed on top of him. The defendant put a condom on and had vaginal sex with her. B.W. did not talk and only moaned during the sexual act. The defendant wrote a note to her to explain why they had sexual relations and placed it in her bra while she slept. When Jamol and Nelson arrived at approximately 7 a.m., they saw B.W. asleep and passed out on her bed. The statement at the police station contained the following: "[The defendant] states while having sex with [B.W.], he knew she was so intoxicated and was zombie-like, completely out of it from drinking so much alcohol."

¶ 13    At trial the defendant denied making many of the handwritten statements. He stated that while he was asleep in B.W.'s roommate's bed, B.W., fully clothed, woke him up and said, "fuck me like you never fucked a girl before." The defendant "brushed it off" and went back to sleep, but B.W. woke him again. She was wearing only a thong and a bra. She straddled him and committed an oral sexual act on him. The defendant testified that he "gave in" and had vaginal sex with B.W. for approximately 40 minutes until they fell asleep. He denied having anal sex with her. After Jamol woke the defendant some hours later, B.W. went into the bathroom. When she came out, B.W. gave the defendant a hug and kiss and told the defendant to call her. The defendant said that he wrote the note "during the time in between after we went to sleep."

-4-

¶ 14     A police detective who spoke to B.W. on February 3, 2007, testified at trial that B.W. told him that she did not remember anything about the assault. Another detective who interviewed B.W. on February 19 testified that B.W. told her she had passed out from drinking and did not remember any sexual acts with the defendant. B.W. testified at trial that her answers to the nurse's questions at the hospital were not from her recollection of the events, but were based on the note that the defendant left her.

¶ 15     At trial B.W. testified that while the defendant was in the apartment alone with her, she woke up with him on top of her. B.W. claimed that she tried to push the defendant off and that she told him "no." B.W. stated that she had "[p]eriods of blacking out, coming in and out" "[a]nd I was laying on my bed and he was forceful. He was trying to have sex with me, on top of me."

¶ 16     The jury found the defendant guilty of the offense of criminal sexual assault and the trial court imposed a sentence of five years of imprisonment. The defendant filed a timely appeal from his conviction and sentence.

¶ 17                                   ANALYSIS

¶ 18     The first issue that we review is whether the trial court violated the defendant's right to due process and a fair trial when it instructed the jurors that the term "reasonable doubt" was for them to define. Generally, an issue concerning the propriety of a jury instruction is reviewed under an abuse of discretion standard; however, our review is *de novo* when the issue is whether the applicable law was correctly conveyed by the jury instruction. *Barth v. State Farm Fire & Casualty Co.*, 228 Ill. 2d 163, 170, 886 N.E.2d 976, 980 (2008).

¶ 19     In this case, the jurors had been deliberating for several hours when they asked for a "more explicit, expansive definition of reasonable doubt." Defense counsel proposed that the jury be told that "reasonable doubt is not specifically defined under Illinois law. It is not any doubt, only that which is reasonable." The trial court then proposed the following: "reasonable doubt is not defined under Illinois law. It is for the jury to collectively determine what reasonable doubt is." The parties agreed to this explanation. The defendant did not include this issue in his posttrial motion. A defendant must object at trial to the alleged error and include it in his written posttrial motion or the issue is forfeited for appellate review. *People v. Enoch*, 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1130 (1988).

¶ 20     The defendant urges us to consider the issue under the plain error doctrine that allows review of unpreserved issues when: (1) a clear or obvious error, regardless of the seriousness of the error, occurred where the evidence was so closely balanced that the error alone threatened to tip the scales of justice against the defendant; or (2) the clear or obvious error was so serious it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Piatkowski*, 225 Ill. 2d 551, 565, 870 N.E.2d 403, 410-11 (2007); *People v. Herron*, 215 Ill. 2d 167, 178-79, 830 N.E.2d 467, 475 (2005). The defendant in this case claims that this unpreserved issue should be examined under the plain error rule because both prongs of the doctrine are applicable to his case. We believe there is merit to the defendant's argument that the evidence in this case was closely balanced. The first step in the process is to determine

whether error occurred. *Piatkowski*, 225 Ill. 2d at 565, 870 N.E.2d at 411.

¶ 21 The defendant claims that the explanation given by the trial court to the jury was against the long-standing rule in Illinois that the term "reasonable doubt" is self-defining and needs no further elaboration. *People v. Cagle*, 41 Ill. 2d 528, 536, 244 N.E.2d 200, 2004 (1969). The defendant goes on to argue that "empirical evidence strongly suggests that without a firm instruction, a criminal jury left to its own accord is prone to adopt a mere preponderance standard."

¶ 22 The defendant contends that this is structural error because it does not yield a real jury verdict within the meaning of the sixth amendment. See *Sullivan v. Louisiana*, 508 U.S. 275, 281-82 (1993). The defendant points out that the due process clause of the United States Constitution "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). He alleges that because of the trial court's error, there is a "reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet the *Winship* standard." *Victor v. Nebraska*, 511 U.S. 1, 6 (1994).

¶ 23 The State agrees that the words "reasonable doubt" are self-defining and no better definition exists than the words themselves. *People v. Wielgos*, 220 Ill. App. 3d 812, 820, 581 N.E.2d 298, 304 (1991); *People v. Hughes*, 167 Ill. App. 3d 265, 267, 521 N.E.2d 240, 242 (1988). The State maintains that the defendant cannot raise the issue of an improper jury instruction on appeal when it is the instruction that he offered and agreed to. *People v. Patrick*, 233 Ill. 2d 62, 77, 908 N.E.2d 1, 9-10 (2009). The State argues that if this court does decide to address the issue, that no error, much less plain error, occurred.

¶ 24 The defendant relies upon the case of *United States v. Hernandez* for support of his argument that the trial court erred in responding to the jury's question regarding reasonable doubt. *United States v. Hernandez*, 176 F.3d 719 (3d Cir. 1999). The State argues that the *Hernandez* case is clearly distinguishable because the trial court in that case instructed the jury that reasonable doubt was " '*what you in your own heart and your own soul and your own spirit and your own judgment determine is proof beyond a reasonable doubt*.' " (Emphasis in original.) *Id*. at 729. The federal Court of Appeals for the Third Circuit reversed the defendant's conviction because "a juror may well have concluded that a 'gut feeling' as to the defendant's guilt was adequate to convict so long as that feeling was supported by a preponderance of the evidence (or even less)." *Id.* at 732.

¶ 25 We agree that the jury instruction given in the *Hernandez* case is distinguishable from the instruction given in this case. However, we conclude that the trial court in this case erred when it gave its explanation of reasonable doubt to the jury. By instructing the jurors that they should collectively determine what reasonable doubt was, the court allowed the jury to use a standard that in all likelihood was below the threshold of a reasonable doubt standard. The response offered by defense counsel that "[i]t is not any doubt, only that which is reasonable," would have been more appropriate than the explanation that was given by the trial court. The best response for the trial court to have made would have been to refuse to give the jury an additional explanation. See *People v. Failor*, 271 Ill. App. 3d 968, 970, 649

N.E.2d 1342, 1343 (1995) (where the appellate court emphasized that the Illinois Supreme Court has consistently held that neither the trial court nor counsel should define the term; the fact that the pattern instruction does not include a definition for reasonable doubt indicates that none should be given). The effort by the trial court in this case can be construed as an attempt to define that which the Illinois Supreme Court has said cannot be defined in this way.

¶ 26    We also note that it has been held that the principle that a jury is entitled to have answers to its legal questions does not include a request to have reasonable doubt defined. *People v. Vasquez*, 368 Ill. App. 3d 241, 254-55, 856 N.E.2d 523, 536 (2006).

¶ 27    In this case where the jury had the difficult task of deciding whether the 17-year-old defendant knew that B.W. was unable to give consent to the sexual acts, it is critical that the jury understood what standard of proof it was to utilize. The explanation which the trial court provided did not clarify the meaning of reasonable doubt, especially in light of the facts of this case. We hold that the trial court's error regarding its explanation to the jury of the meaning of reasonable doubt was plain error under both the first and second prongs of the plain error rule. Under the first prong, because of the closeness of the evidence in this case, the clear error threatened to tip the scales of justice against the defendant. The jury may have used a lesser standard of doubt than reasonable doubt since they were to collectively determine what the term meant. Similarly, under the second prong, this error was so serious that it affected the fairness of the defendant's trial and his right to due process, thereby challenging the integrity of the judicial process. See *Piatkowski*, 225 Ill. 2d at 565, 870 N.E.2d at 410-11.

¶ 28    The next issue raised by the defendant is that the trial court failed to instruct the jury that they may consider whether or not he made the attributed statements to the police and assistant state's attorney on February 20, 2007. At trial, the defendant denied making many of the statements contained in the handwritten document that he signed at the police station. The trial court gave the following instruction, which did not include the bracketed optional language:

> "You have before you evidence that the defendant made a statement relating to the offense charged in the indictment. It is for you to determine [*whether the defendant made the statement[s], and, if so,*] what weight should be given to the statement. In determining the weight to be given to a statement, you should consider all of the circumstances under which it was made." (Emphasis added.) Illinois Pattern Jury Instructions, Criminal, No. 3.06–3.07 (4th ed. 2000) (IPI Criminal 4th No. 3.06–3.07).

¶ 29    The defendant argues that the bracketed portion, "whether the defendant made the statement[s]" should be deleted only when a defendant admits making all of the material statements attributed to him. IPI Criminal 4th No. 3.06–3.07, Committee Notes, at 91; *People v. Echols*, 382 Ill. App. 3d 309, 315-16, 887 N.E.2d 793, 799 (2008).

¶ 30    In this case, the defendant denied that Assistant State's Attorney O'Sullivan reread the police statement to him even though his signature appears on every page. He argues that among other inaccuracies in the statement, he denies he used the word "inebriated" to

describe B.W. and points out that he would not have used such a word because he did not know the definition of the word. That denial has a ring of credibility when considered against the language and grammar used by the defendant in the note that he wrote to B.W. He also denied carrying B.W. to the car and claimed that he only assisted her to the car. He also denied that B.W. was "totally out of it where she couldn't, she wasn't responding or couldn't walk" when they went to the car. Significantly, he likewise denied that when he was questioned by police and the assistant State's Attorney, he described B.W. as being "zombie-like" during the sexual encounter. The defendant claims that the inappropriate jury instruction foreclosed the jury from considering whether he made only *portions* of the statements attributed to him.

¶ 31    The defendant claims that his counsel objected to this jury instruction on this issue. However, the record reveals that defense counsel objected to a different jury instruction that the defendant is not challenging on appeal and there was no objection to the jury instruction that is an issue on appeal. The State contends that because the defendant did not object to this specific jury instruction at trial, nor did he include the issue in his posttrial motion, he has forfeited the issue. We agree. In order to determine the applicability of the plain error doctrine, we will determine first, if error was committed by the trial court. We can then determine whether review of the error is appropriate under the plain error rule. *Herron*, 215 Ill. 2d at 178-79, 830 N.E.2d at 410-11. We will utilize a *de novo* standard when examining jury instructions as a whole to determine if the jury was comprehensively apprised of the relevant, appropriate, legal principles. *People v. Parker*, 223 Ill. 2d 494, 501, 861 N.E.2d 936, 939 (2006).

¶ 32    The State points out that the jury was also told the following as part of the instruction on prior inconsistent statements of a witness:

> "It is for you to determine whether the witness made the earlier [*inconsistent*] statement and, if so, what weight should be given to that statement. In determining the weight to be given to an earlier statement, you should consider all of the circumstances under which it was made." (Emphasis added.) Illinois Pattern Jury Instructions, Criminal, No. 3.11 (4th ed. 2000) (IPI Criminal 4th No. 3.11).

The State argues that the italicized language is virtually identical to the bracketed language that the trial court did not include in IPI Criminal 4th No. 3.06–3.07. The State contends that the instructions, taken in their totality, properly instructed the jury as to the law to be applied in this case. Therefore, any error that may have been committed by the trial court was harmless and was cured when the jury was instructed on the weight to be given prior inconsistent statements pursuant to IPI Criminal 4th No. 3.11.

¶ 33    The defendant makes a credible argument that it is unclear which instruction the jury chose to follow. He argues that this was highly prejudicial to him because the statements allegedly made at the police station were central to the State's case and were the focal point of its rebuttal closing argument. The defendant argues in summary that since he denied making the statements, the jury was not properly instructed regarding the weight to be given to the statements.

¶ 34    We agree with the defendant that the trial court should have included the bracketed

portion of IPI Criminal 4th No. 3.06–3.07. Failure by the trial court to do so amounted to error under both prongs of the plain error doctrine. As stated previously, the evidence in this case was closely balanced. We find that this error threatened to tip the scales of justice away from the defendant. We believe that it was important to give the instruction in question and failure to do so deprived the defendant of a fair trial and impacted the integrity of the judicial process, satisfying the second prong of the plain error doctrine. The defendant's statements made at the police station were, as the defendant argues, central to the State's case. Therefore, proper jury instructions related to those statements were imperative. Contrary to the State's contention, the jury instruction regarding prior inconsistent statements did not cure the error.

¶ 35     We hold that the two errors, which we have determined constituted plain errors, were sufficiently serious as to require a reversal of the defendant's conviction and sentence. Accordingly, we need not address the defendant's remaining issues.

¶ 36     For the reasons discussed, we reverse the defendant's conviction and sentence and remand the case to the trial court for a new trial. We note that for purposes of double jeopardy analysis, if the evidence had been presented in a manner free from the errors discussed, there was sufficient evidence to convict the defendant of the offense charged. See *People v. Baines*, 399 Ill. App. 3d 881, 900, 927 N.E.2d 158, 173 (2010).

¶ 37     Reversed and remanded for a new trial.