# Illinois Official Reports

## Appellate Court

**People v. Gashi, 2015 IL App (3d) 130064**

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LIRIDON GASHI, Defendant-Appellant. |
| District & No. | Third District<br>Docket No. 3-13-0064 |
| Filed | April 7, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Henry County, No. 12-CF-22; the Hon. Ted J. Hamer, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Mario Kladis, of State Appellate Defender's Office, of Ottawa, for appellant.<br><br>Matthew P. Schutte, State's Attorney, of Cambridge (Laura E. DeMichael, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

JUSTICE LYTTON delivered the judgment of the court, with opinion.
Presiding Justice McDade specially concurred, with opinion.
Justice Schmidt concurred in part and dissented in part, with opinion.


**OPINION**

¶ 1     Defendant Liridon Gashi was convicted of two counts of aggravated criminal sexual abuse following a jury trial. The trial court sentenced defendant to 24 months of conditional discharge. Defendant appeals, arguing that he was denied a fair trial because the trial court (1) told jurors that they could decide what "reasonable doubt" means, and (2) failed to ask prospective jurors if they understood and accepted each of the principles set forth in Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). We agree that the trial court committed reversible error by telling jurors that they could decide for themselves what "reasonable doubt" means. We reverse and remand.

¶ 2                                     FACTS

¶ 3     In January 2012, the State charged defendant, a 24-year-old, with six counts of aggravated criminal sexual abuse. 720 ILCS 5/12-16(d) (West 2010). Counts I, III and V of the information alleged that defendant inserted his finger into the vagina of M.G.S., a 16-year-old, between November 2011 and December 2011. Counts II, IV, and VI alleged that defendant fondled M.G.S.'s breasts during the same time period. Defendant pled not guilty. The case proceeded to a jury trial.

¶ 4     During *voir dire*, the trial judge stated that defendant was presumed innocent, and then asked the potential jurors, "Is there anybody that disagrees with that?" After noting that no one raised a hand, the judge continued: "Before Mr. Gashi can be convicted–in other words, found guilty–the State of Illinois through [the prosecutor], must prove him guilty beyond a reasonable doubt. Is there anybody that has any difficulty with that?" When no one raised a hand, the judge continued:

> "Beyond a reasonable doubt is the highest standard of proof. It's the same burden in every courtroom throughout the United States. And I'll also tell you this: At the end of the case, you're going to get jury instructions on the law, but you will not get a definition of beyond a reasonable doubt. That is for you to determine.
>
> Mr. Gashi is not required to offer any evidence on his behalf. In other words, he does not have to testify. He does not have to have [his attorney] ask questions. He does not have to call any witnesses on his behalf. Is there anybody that has difficulty with that?
>
> Let the record reflect that no one raised their hand.
>
> Mr. Gashi also does not have to testify in this case, and you are not to hold that against him in arriving at your verdict if he does not testify. In other words, you can't say, well, he didn't testify, he must be guilty because he didn't testify. That's not the way it works. You are not to hold that against him in any way. Is there anybody that has any difficulty with that?

Let the record reflect that no one raised their hand."

¶ 5        After the jury was selected but before the trial began, the trial judge stated: "As I said earlier today, you will decide what reasonable doubt is. There's not going to be a jury instruction that explains it to you. It is what it is, beyond a reasonable doubt."

¶ 6        Defendant's trial then began with the testimony of M.G.S., who testified that she worked with defendant at Parkway Grill in 2011, when she was 16 years old. He was a cook, and she was a waitress. She and defendant began texting each other in September "and started a physical relationship [in] late October, early November" of 2011. In one of her texts, she told defendant that she was 16 years old. She and defendant talked once about their relationship being illegal because of her age. M.G.S. could not recall the specifics of that conversation.

¶ 7        M.G.S. and defendant kissed approximately five or six times in the back hallway and just outside the back door of Parkway Grill from late October to early November. In mid-November 2011, defendant began touching her breasts and vagina under her clothing. She estimated that defendant touched her breasts and vagina approximately 5 to 15 times between mid-November to mid-December 2011. He inserted his finger in her vagina five to eight times during that time period. These activities took place at Parkway Grill and defendant's apartment.

¶ 8        In December 2011, Jan Stohl, the mother of one of M.G.S.'s friends, found out what defendant was doing and confronted M.G.S., defendant and the owner of Parkway Grill. After that, M.G.S. told her mother what defendant had been doing. Her mother took her to the police station to file a police report. The last time defendant touched M.G.S. was approximately a week before she went to the police station.

¶ 9        M.G.S. testified that her relationship with defendant was secret by "[d]esign." She and defendant never went out in public together. In Illinois, people tell M.G.S. that they think she looks older than she is. In Missouri, where M.G.S. now lives, people tell her that she looks younger than she is.

¶ 10       Jan Stohl testified that she has known M.G.S. since she was "about six months old." Stohl's daughter and M.G.S. were friends. In mid-December 2011, Stohl learned that M.G.S. was having an improper relationship with defendant, so she went to Parkway Grill and spoke to the owner of the restaurant, defendant and M.G.S. Stohl asked defendant if he knew his relationship with M.G.S. was illegal. Defendant responded, "yes," and said he understood. When Stohl asked defendant if he knew he could go to jail for what he did to M.G.S., defendant answered, "yes," he did know that but said "I'm not going to jail." According to Stohl, defendant also apologized and said he "knew that it was wrong."

¶ 11       Stohl testified that her conversation at Parkway Grill lasted approximately 15 to 20 minutes. During that time, she repeatedly stated that defendant's actions were wrong and illegal. She also repeatedly asked defendant if he knew that his actions were wrong and illegal. Every time she asked defendant that question, he said that he knew it was illegal and that he was sorry. She admitted that she was talking quickly at the beginning of the conversation but slowed down as she became calmer. Defendant seemed to understand what she was saying during the entire conversation.

¶ 12       Steve Whittington, a police officer for the City of Geneseo, testified that he and another officer, Tim Wise, interviewed defendant at the police station on January 18, 2012. A DVD of that interview was played for the jury. In that interview, defendant stated he is from Kosovo

and has lived in the United States for three years. He learned English while living in Kosovo. Defendant said that he had known M.G.S. for five to seven months. He admitted kissing her a few times in his car and his apartment. He also admitted that he touched her breasts and inserted his finger in her vagina one time at his apartment. When Officer Whittington asked defendant if he knew how old M.G.S. was, he said, "After we did that, then I knew exactly how old she is." He never considered M.G.S. to be his girlfriend but said that he would want to be M.G.S.'s boyfriend "[i]f she's over 18."

¶ 13    After the State presented its witnesses, defendant moved for a directed verdict, which the trial court denied. Defendant then testified that he did not find out that M.G.S. was 16 years old until January 18, 2012, when he went to the police station, and Officer Whittington told him. He denied ever texting M.G.S. about his age or anything else. He testified that it was "not possible" for him to know that M.G.S. was 16 years old because "she looks more mature than her age." He thought M.G.S. was between 17½ and 18 years old because she was a waitress, and he believed that waitresses had to be 18 or older.

¶ 14    Defendant testified that when Stahl confronted him at Parkway Grill, she was talking fast, and he had difficulty understanding everything she was saying. He testified that he did not know what "jail" meant until the day he went to the police station. He testified that "[e]verything that happened with [M.G.S.] happened only twice." He testified that he touched M.G.S.'s breasts over her shirt once to push her away when she tried to kiss him. After that, he put his hand under M.G.S.'s shirt and bra and touched her breasts one time in his apartment. He testified that he touched her vagina only over her pants. He admitted that he told the officers that he inserted his finger in M.G.S.'s vagina but said he thought that meant he touched "her vagina even though my hand was on the–on the pants."

¶ 15    After defendant's testimony, the jury was excused until the following day. The next morning, the jury was given instructions and heard closing arguments. By early that afternoon, the jury had reached a verdict. The jury found defendant guilty of two counts of aggravated criminal sexual abuse (counts I and II of the information). 720 ILCS 5/12-16(d) (West 2010). The trial court sentenced defendant to 24 months of conditional discharge.

¶ 16                                          I

¶ 17    Defendant first argues that the trial judge committed reversible error by telling jurors that they could "decide" and "determine" the meaning of "reasonable doubt" for themselves.

¶ 18    It is well settled that courts in this state should refrain from attempting to define "reasonable doubt." *People v. Speight*, 153 Ill. 2d 365, 374 (1992); *People v. Flynn*, 378 Ill. 351, 356 (1941); *People v. Johnson*, 317 Ill. 430, 436 (1925). This is because the concept of "reasonable doubt" is self-explanatory; it "needs no explanation." *People v. Garcia*, 103 Ill. App. 3d 779, 784 (1981); *Flynn*, 378 Ill. at 356; *Johnson*, 317 Ill. at 436. "There is no better definition of reasonable doubt than the words themselves." *People v. Jenkins*, 89 Ill. App. 3d 395, 398 (1980). Providing a definition of reasonable doubt is more likely to confuse a jury than clarify its meaning. *Johnson*, 317 Ill. at 436.

¶ 19    Illinois appellate courts disagree about whether it is permissible for a trial judge to tell jurors that they can decide for themselves what reasonable doubt means. See *People v. Thomas*, 2014 IL App (2d) 121203, ¶ 47 (permissible); *People v. Downs*, 2014 IL App (2d) 121156, ¶ 28 (impermissible); *People v. Johnson*, 2013 IL App (1st) 111317, ¶ 54

(permissible); *People v. Franklin*, 2012 IL App (3d) 100618, ¶ 28 (impermissible); *People v. Turman*, 2011 IL App (1st) 091019, ¶ 25 (impermissible).

¶ 20    The first Illinois court to address the issue was the First District. See *Turman*, 2011 IL App (1st) 091019. In *Turman*, after several hours of deliberating, the jurors asked the trial judge for a " 'more explicit, expansive definition of reasonable doubt.' " *Id*. ¶ 19. The trial judge responded, " '[R]easonable doubt is not defined under Illinois law. It is for the jury to collectively determine what reasonable doubt is.' " *Id*. The First District ruled that the trial court erred in giving this explanation of reasonable doubt to the jury. *Id*. ¶ 25. The court stated that "[b]y instructing the jurors that they should collectively determine what reasonable doubt was, the court allowed the jury to use a standard that in all likelihood was below the threshold of a reasonable doubt standard." *Id*.

¶ 21    Our court was the next to rule that a trial court erred in instructing potential jurors that they could define "reasonable doubt" for themselves. *Franklin*, 2012 IL App (3d) 100618. In *Franklin*, the trial judge instructed venire members: " 'Beyond a reasonable doubt means beyond a reasonable doubt. It's what each of you individually and collectively, as 12 of you, believe is beyond a reasonable doubt.' " *Id*. ¶ 4. We held that the court's attempt to explain reasonable doubt was improper because there is no better definition of reasonable doubt than the words themselves. *Id*. ¶ 25. We further held that "by telling jurors that it was for them to collectively determine what reasonable doubt meant, there is a reasonable likelihood that the jurors understood the instruction to allow a conviction based on proof less than a reasonable doubt." *Id*. ¶ 28 (citing *Turman*, 2011 IL App (1st) 091019, ¶¶ 25, 27).

¶ 22    One year later, a panel of the First District different than the panel that decided *Turman* issued a contrary opinion. See *Johnson*, 2013 IL App (1st) 111317. In *Johnson*, the trial court told potential jurors during *voir dire* that " 'proof beyond a reasonable doubt' " is " 'not defined by the Supreme Court or by the State legislature' " but is " 'something for you to decide.' " *Id*. ¶ 52. The First District reasoned that the trial court's statements did not constitute error because the judge also told potential jurors that " '[p]roof beyond a reasonable doubt is the highest burden that there is at law in Illinois and the United States.' " *Id*. ¶¶ 52-54.

¶ 23    The Second District has also issued conflicting decisions regarding whether a trial court can instruct jurors to define reasonable doubt for themselves. See *Downs*, 2014 IL App (2d) 121156; *Thomas*, 2014 IL App (2d) 121203. In *Downs*, the jury sent the trial judge a note during deliberations and asked, " 'What is your definition of reasonable doubt, 80%, 70%, 60%?' " *Downs*, 2014 IL App (2d) 121156, ¶ 17. The court responded, " 'We cannot give you a definition[;] it is your duty to define.' " *Id*. Relying on the First District's decision in *Turman* and our decision in *Franklin*, the Second District ruled that the trial court's response impermissibly instructed the jurors that they could collectively define reasonable doubt. *Id*. ¶ 27. The court also found that there was "manifest" danger that the jury might have used a standard less than reasonable doubt since the jury's question suggested that it was considering using a lower standard. *Id*. ¶ 28.

¶ 24    Just a few months later, the Second District issued its decision in *Thomas*, 2014 IL App (2d) 121203. In that case, jurors sent the trial judge a note during deliberations asking, " '[W]hat is the legal definition of reasonable doubt?' " *Id*. ¶ 14. In a written note, the judge responded, " 'It is for you to determine ***.' " *Id*. The Second District found that the trial court's "response was unquestionably correct" and "a correct statement of Illinois law." *Id*. ¶ 47. However, Justice Hudson, specially concurring, found that telling jurors that

- 5 -

reasonable doubt " 'is for you to decide' " is risky because it "could be read as vesting a jury with the discretion to interpret the term to mean whatever it wants it to mean." *Id*. ¶ 56 (Hudson, J., specially concurring).

¶ 25    Here, where the trial court told jurors that they could "decide" or "determine" for themselves what reasonable doubt means, the court committed error. See *Turman*, 2011 IL App (1st) 091019, ¶ 25. However, defendant did not object or raise this issue in a posttrial motion, so it is waived unless defendant can establish plain error. See *Franklin*, 2012 IL App (3d) 100618, ¶ 22. A "defective reasonable doubt instruction" constitutes a structural error under the second prong of the plain-error doctrine that requires reversal and remand for a new trial. See *id*. ¶ 23. A constitutionally deficient reasonable doubt instruction is one that does not correctly convey the concept of reasonable doubt and creates a reasonable likelihood that the jury understood the instruction to allow them to find the defendant guilty based on a standard of proof less than beyond a reasonable doubt. *Id*.; *Victor v. Nebraska*, 511 U.S. 1, 5 (1994).

¶ 26    A judge's statement to potential jurors that they are free to "decide what reasonable doubt is" implies "that there is an extraordinarily broad range of possible meanings" for the concept of "reasonable doubt," some of which may be unconstitutional. See *Wansing v. Hargett*, 341 F.3d 1207, 1214 (10th Cir. 2003). Such a statement makes "it reasonably likely that the jury would overestimate the amount of latitude it had in defining the reasonable doubt standard." *Id*. at 1215. It subverts the self-explanatory character of the term and invites the jurors to decide the definition of "reasonable doubt" for themselves. See *id*. at 1214. A trial judge sends an unconstitutional message by telling jurors that they have discretion to make their own subjective determination about what "reasonable doubt" means. See *id*. at 1215.

¶ 27    The timing of a trial court's comments about "reasonable doubt" is relevant in determining the likelihood that the comments influenced the jury. *Id*. When the judge makes such statements during *voir dire* and the trial is relatively short, those statements are not "a distant memory" when the jury goes to deliberate. *Id*. Additionally, when the statements are made before trial begins "[i]t is likely that the jurors were particularly receptive to the guidance they received at that time, when they were thinking about the issue and not overburdened with other issues and other instructions." *Id*.

¶ 28    Here, the trial judge told potential jurors during *voir dire* that it was for them to determine what reasonable doubt is. Later, after the jury was chosen but before trial began, the judge reiterated that the jurors "decide what reasonable doubt is." These statements sent an unconstitutional message to jurors that they had discretion to determine what "reasonable doubt" means. See *id*. at 1214. These statements likely influenced the jury because they were made just one day before the jury reached its verdict, making the statements fresh in the jurors' minds when they deliberated. See *id*. They were also made at a time when the jurors were likely receptive to the court's guidance because the trial had not yet begun and they were not overburdened by other issues or instructions. See *id*. Based on the totality of the circumstances, there is a reasonable likelihood that the jury understood the trial court's statements to allow them to find defendant guilty based on a standard of proof that was less than beyond a reasonable doubt. Thus, we reverse and remand for a new trial.

¶ 29    Although not binding on retrial, the evidence in this case was sufficient to prove defendant guilty beyond a reasonable doubt, so double jeopardy does not bar retrial. See *People v. Junior*, 349 Ill. App. 3d 286, 293 (2004).

¶ 31        Defendant also argues that the trial court committed reversible error by failing to ask prospective jurors whether they understood all of the principles set forth in Rule 431(b).

¶ 32        This is a question of law we review *de novo*. *People v. Belknap*, 2014 IL 117094, ¶ 41. Defendant did not object or raise this issue in a posttrial motion; therefore, any claimed error must be the subject of plain-error analysis. See *People v. Wilmington*, 2013 IL 112938, ¶ 31. The plain-error doctrine allows errors not previously challenged to be considered on appeal if either: (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant; or (2) the error was so fundamental and of such magnitude that it affected the fairness of the trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *Id.*

¶ 33        The first step of plain-error analysis is to consider whether an error occurred. See *id.* Rule 431(b) provides:

> "(b) The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's decision not to testify when the defendant objects." Ill. S. Ct. R. 431(b) (eff. July 1, 2012).

¶ 34        "[T]he language of Rule 431(b) is clear and unambiguous ***." *People v. Belknap*, 2014 IL 117094, ¶ 45. It requires trial courts to ask prospective jurors whether they both understand and accept the four principles set forth in the rule. *Id.* ¶ 46. "The failure to do so constitutes error." *Id.* ¶ 45 (citing *People v. Thompson*, 238 Ill. 2d 598, 607 (2010)).

¶ 35        Here, the trial court asked potential jurors if any of them "disagreed with" the first principle and had "difficulty with" the remaining three principles. Asking potential jurors if they have "difficulty with" a principle encompasses both understanding and acceptance because a person who does not understand or accept a principle would have "difficulty with" it. *People v. Ware*, 407 Ill. App. 3d 315, 356 (2011). Asking venire members if they "disagree with" a principle may be tantamount to asking whether they accept it; however, it does not satisfy Rule 431(b)'s requirement that the court also inquire whether potential jurors understand the principle. *Belknap*, 2014 IL 117094, ¶ 46; *Wilmington*, 2013 IL 112938, ¶ 32. In this case, the trial court failed to ask the jurors whether they understood the first principle. Thus, the court committed error. See *id.*

¶ 36        Now we must determine if the error necessitates reversal pursuant to the plain-error rule. Rule 431(b) errors are not structural errors under the second prong of the plain-error analysis. See *Belknap*, 2014 IL 117094, ¶ 47; *Wilmington*, 2013 IL 112938, ¶ 33. Thus, defendant is entitled to reversal only if he satisfies the first prong of the plain-error doctrine: that the evidence is so closely balanced that the error alone threatened to tip the scales of justice against him. See *Wilmington*, 2013 IL 112938, ¶ 34. In reviewing a claim under the first prong of the plain-error doctrine, the reviewing court "must make a commonsense assessment of the evidence within the context of the circumstances of the individual case." *Belknap*, 2014 IL 117094, ¶ 52.

¶ 37        A person "commits aggravated criminal sexual abuse if he or she commits an act of sexual penetration or sexual conduct with a victim who was at least 13 years of age but under 17 years of age and the accused was at least 5 years older than the victim." 720 ILCS 5/12-16(d) (West 2010). "It shall be a defense under *** subsection (d) of Section 12-16 of this Code that the accused reasonably believed the person to be 17 years of age or over." 720 ILCS 5/12-17 (West 2010).

¶ 38        Here, both M.G.S. and defendant consistently testified that defendant touched M.G.S.'s breasts. M.G.S. also testified that defendant inserted his finger in her vagina. While defendant testified at trial that he only touched M.G.S.'s vagina outside of her clothes, during his interview with Whittington and Wise, he admitted inserting his finger in her vagina. Thus, the evidence that defendant committed acts of sexual penetration and sexual conduct against M.G.S. was not closely balanced.

¶ 39        The evidence that defendant did not reasonably believe M.G.S. was 17 years of age or older was also not closely balanced. Defendant testified at trial and told Whittington and Wise that he did not know M.G.S. was under 17 years old when he touched her and only learned that she was 16 years old when the officers told him. However, M.G.S. testified that she told defendant her age before their relationship became "physical." She further testified that she and defendant talked about the illegality of their relationship, which is why they kept it a secret. Further, Stohl testified that defendant acknowledged that his relationship with M.G.S. was illegal and could cause him to go to jail.

¶ 40        Because the evidence in this case was not closely balanced, defendant is not entitled to reversal under either prong of the plain-error doctrine because of the trial court's failure to strictly comply with the Rule 431(b) requirements. See *Wilmington*, 2013 IL 112938, ¶ 34.

¶ 41                                CONCLUSION

¶ 42        The judgment of the circuit court of Henry County is reversed, and the cause is remanded for further proceedings.

¶ 43        Reversed and remanded.

¶ 44        PRESIDING JUSTICE McDADE, specially concurring.

¶ 45        I agree with and concur in (1) the finding that the trial court committed reversible error by telling jurors that they could decide for themselves what "reasonable doubt" means and (2) in the decision to reverse and remand.

¶ 46        I write separately to note that we have recently considered several cases raising this same issue, and it strikes me that the problem may arise because we are conflating two concepts which ought, in fact, to remain separate. One is the *meaning* of reasonable doubt and the second is the jury's duty to determine whether any doubt they have about the defendant's guilt is reasonable.

¶ 47        The jury is told, quite properly, that there is no definition for the term "reasonable doubt." I believe that impropriety arises when they are then told that it is for them to determine what reasonable doubt means or is. That would appear to be an invitation for the jurors to define what is otherwise purposely undefined.

¶ 48      In reality, what we want them to do is assess all of the evidence and evaluate the credibility of the witnesses and then decide whether any doubt they may feel about the defendant's guilt is reasonable.

¶ 49      I wonder if an instruction along the following lines, if approved, might be helpful:

> "Reasonable doubt is not defined and it is not for you to define it. Rather, it is the duty of each of you to assess all of the evidence and evaluate the credibility of the witnesses and then decide whether any doubt you may feel about the defendant's guilt is reasonably supported by what the evidence has or has not shown or is an unwarranted or unreasonable stretch."

¶ 50      JUSTICE SCHMIDT, concurring in part and dissenting in part.

¶ 51      I concur in the majority's decision that the evidence in this case was not closely balanced and the trial judge's failure to strictly comply with Rule 431(b) requirements is not plain error and, therefore, not reversible. I dissent from that portion of the opinion that reverses the defendant's conviction based upon the trial judge's statements regarding reasonable doubt. As the majority correctly notes, the United States Supreme Court has explained that the proper inquiry is not whether a reasonable doubt instruction could have been applied in an unconstitutional manner, but whether there is a reasonable likelihood that the jury did so apply it. *Supra* ¶ 25; *Victor v. Nebraska*, 511 U.S. at 5; *Estelle v. McGuire*, 502 U.S. 62, 72 (1991).

¶ 52      The majority incorrectly characterizes the trial judge's comments about reasonable doubt as "[telling] jurors that they could 'decide' or 'determine' for themselves what reasonable doubt means." *Supra* ¶ 25. As the Supreme Court made clear in *Victor*, the language in an instruction "cannot be sequestered from its surroundings." *Victor v. Nebraska*, 511 U.S. at 16. Here, again, the trial judge stated:

> "Before Mr. Gashi can be convicted–in other words, found guilty–the State of Illinois, through Mr. Patten, must prove him guilty beyond a reasonable doubt. Is there anybody that has any difficulty with that?
>
> Beyond a reasonable doubt is the highest standard of proof. It's the same burden in every courtroom throughout the United States. And I'll also tell you this: At the end of the case, you're going to get jury instructions on the law, but you will not get a definition of beyond a reasonable doubt. That is for you to determine."

After the jury was selected but before the trial began, the trial judge stated:

> "As I said earlier today, you will decide what beyond a reasonable doubt is. There's not going to be a jury instruction that explains that to you. It is what it is, beyond a reasonable doubt."

¶ 53      Looking at the trial judge's comments as a whole, as the Supreme Court says we must, there is nothing that should lead a reasonable person to conclude there is a reasonable likelihood that the jury understood these comments to allow conviction based on anything other than proof beyond a reasonable doubt. There is no reasonable likelihood that the jurors who determined defendant's guilt applied the court's comments in a way that violated the Constitution. See *Victor*, 511 U.S. at 22-23. The trial court explained the State's burden of proof was "the highest standard of proof" as "in every courtroom throughout the United States." When further explaining that there would be no formal instruction on reasonable doubt, the court explained, "It is what it is, beyond a reasonable doubt." It is a mystery to me as

to how any person, reasonable or otherwise, could construe the judge's comments as an invitation to convict on an unconstitutional standard. Yet, the majority concludes that not only could the jury have done so, it likely did.

¶ 54 Further, the trial court's statement is a correct statement of the law. Query: If the court will not define reasonable doubt, who is left to do so? There is only one possible answer: the jury. I believe that the Second District got it right in *People v. Thomas*, 2014 IL App (2d) 121203. The majority finds comfort in Justice Hudson's special concurrence in which he opined that the language " 'could be read as vesting a jury with the discretion to interpret the term to mean whatever it wants it to mean.' " *Supra* ¶ 24 (quoting *People v. Thomas*, 2014 IL App (2d) 121203, ¶ 56 (Hudson, J., specially concurring)). The majority overlooks two important points. Justice Hudson concurred in affirming the trial court. This was undoubtedly because he appreciated what the majority does not. That is, point number two. Remember *Victor*? The analysis does not turn on what was possible or what could have happened, but whether there is a reasonable likelihood that the jury did convict using an unconstitutional standard. *Victor*, 511 U.S. at 5. Notwithstanding his caution to trial judges, Justice Hudson obviously did not believe the jury likely did so (*ergo*, his concurrence) and neither do I.

¶ 55 I would affirm defendant's conviction.