# Illinois Official Reports

## Appellate Court

---

### *People v. Green*, 2017 IL App (1st) 152513

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JARON GREEN, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>Docket No. 1-15-2513 |
| Filed | December 29, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 13-CR-11785; the Hon. Vincent M. Gaughan, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Damon M. Cheronis, of Law Office of Damon M. Cheronis, and Donna Rotunno, of Law Offices of Rotunno & Giralamo, both of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Annette Collins, John E. Nowak, and Mari R. Hatzenbuehler, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE GORDON delivered the judgment of the court, with opinion.<br>Justices McBride and Ellis concurred in the judgment and opinion. |

**OPINION**

¶ 1        Following a jury trial, defendant, Jaron Green, was convicted of first degree murder for the fatal shooting of the victim, Bruce Lee. After considering factors in aggravation and mitigation, the trial court sentenced defendant to 51 years in the Illinois Department of Corrections (IDOC). On appeal, defendant argues that his conviction should be reversed, claiming that (1) the trial court improperly defined the reasonable doubt standard of proof prior to trial, (2) the State made inappropriate remarks during closing arguments, (3) the evidence at trial was insufficient to prove defendant guilty beyond a reasonable doubt, and (4) cumulative errors warrant a reversal of defendant's conviction. For the following reasons, we affirm defendant's conviction.

¶ 2                                    BACKGROUND
¶ 3                              I. Pretrial Proceedings
¶ 4        In June of 2013, defendant was indicted by a grand jury on six counts of first degree murder, and defendant was arraigned on July 11, 2013.

¶ 5        On January 22, 2014, defendant filed a motion to dismiss, arguing that he was deprived of a full and complete defense because the police failed to preserve videotape evidence from the crime scene. The motion to dismiss argued that, in a supplementary report, Detective Patrick Deenihan and Sergeant Patrick McDonagh stated that they observed a camera in the rear of an apartment building on the 700 block of North Hamlin Avenue. According to the report, the detectives viewed the video and observed a man running eastbound through the south alley on Chicago Avenue shortly after the shooting. The report further states that the detectives requested an evidence technician to come to the apartment building to retrieve the videotape. However, the motion to dismiss claims that an assistant State's Attorney informed defense counsel that the police did not preserve the video because it contained "nothing of evidentiary value."

¶ 6        In response, the State argued that the police determined that the video lacked evidentiary value because the person depicted in the video was too far away to be identified. The State claimed that the police called for an evidence technician to retrieve the video anyway, but they ultimately never recovered the video due to either technical or human error. The trial court then denied defendant's motion to dismiss.

¶ 7        Defendant also filed a motion to suppress his identification, requesting that two separate physical lineups, conducted in May of 2013, be suppressed. In his motion, defendant argued that the witnesses, Christopher Roberson[1] and Darian Broomfield, mistakenly identified defendant due to the unduly suggestive nature of the lineup. During the suppression hearing on September 3, 2014, Sergeant McDonagh testified that, in addition to the physical lineups, Broomfield and a third witness, James Holmes,[2] were shown photo arrays in 2011 and that both witnesses identified defendant as the shooter. Detective Rolando Rodriguez also testified that he conducted two physical lineups and that Roberson and Broomfield both identified defendant as the shooter. The trial court considered the totality of the facts in the case,

_____
[1]Christopher Roberson did not testify at trial.
[2]James Holmes did not testify at trial.

- 2 -

determined that the photo arrays and physical lineups were not unduly suggestive, and denied defendant's motion as a result.

¶ 8    On January 12, 2015, Darian Broomfield signed an affidavit claiming that he did not observe defendant shoot the victim and that his previous statement, given on May 17, 2013, was the result of police coercion.

¶ 9                              II. Preliminary Jury Instructions

¶ 10    On May 8, 2015, the trial court began *voir dire* by welcoming the venire and checking that none of the potential jurors had a relationship with the parties or potential witnesses. The trial court then instructed the venire on basic principles of law, stating that its comments are "not final or complete instructions" but those necessary to assist the eventual jurors to "follow the law and evidence in this case." The trial court described the charges against defendant, the nature of the indictment, the presumption of innocence, and the State's burden of proof. Specifically, the trial court stated:

> "These are not your final or complete instructions. Those will come after you've heard all the evidence and the final arguments of the attorneys. When the time for giving instructions come [*sic*], I will first read them to you, and then you'll get them in writing ***.
>
>                              * * *
>
> The next constitutional principle I want to talk to you about is the burden of proof. In a criminal case, the burden of proof is proof beyond a reasonable doubt. Some of you may have sat on civil juries, there the burden of proof is preponderance of evidence, and if you look at a scale, all you have to do is tilt it. And the definition is it's more likely than not that the event occurred, that's preponderance of the evidence.
>
> In a criminal case, again, proof beyond a reasonable doubt is the highest burden of proof at law.
>
> Does anybody have any problems understanding the burden of proof being beyond a reasonable doubt? Please raise their hand.
>
> Indicating no one raised their hand."

The trial court also explained that the burden of proof never shifts from the State to defendant, that defendant is not required to testify, and that no negative inference can be drawn from defendant's decision not to testify. The trial court concluded its opening remarks by telling the jurors that it is their duty to find defendant guilty if, only after hearing all of the evidence against him, they are convinced he is guilty beyond a reasonable doubt.

¶ 11                              III. Evidence at Trial

¶ 12    At trial, the State presented testimony from nine witnesses: (1) Antoinette Monique Butler, the victim's fiancée; (2) Willie Patterson, a delivery driver who was near the shooting; (3) Sergeant Nellie Harb, the first police officer to respond to the crime scene; (4) Larue Bey, a local resident who heard gunshots the night of the crime; (5) Darian Broomfield, an eyewitness to the shooting; (6) Sergeant Patrick McDonagh, a Chicago police officer who interviewed Broomfield; (7) Officer Victor Rivera, a police officer who processed the crime scene; (8) Lisa Gilbert, a forensic fingerprint examiner with the Illinois State Police; and (9) Detective Rolando Rodriguez, a detective who had Broomfield view the physical lineup. The defense

presented testimony from one witness: Detective Patrick Deenihan, a detective who interviewed Broomfield. Defendant exercised his constitutional right not to testify at trial.

¶ 13                                    A. Antoinette Monique Butler's Testimony

¶ 14        The State's first witness, Antoinette Monique Butler, testified that she was the victim's fiancée and that she had known him for four years until his death. She identified a photo of the victim in court. On cross-examination, she testified that the victim revealed that he been shot before and that, on May 18, 2011, the day of the shooting, he told her "kiss my baby for me, but I won't be back." The victim then left the house but she did not know where he was going. She also testified that the victim knew defendant.

¶ 15                                    B. Willie Patterson's Testimony

¶ 16        Next, Willie Patterson testified that he is a delivery driver and that he conducted a delivery to a grocery store on the 3800 block of West Chicago Avenue on May 18, 2011. Patterson and his delivery partner, Jimmy Puckett,[3] arrived at the grocery store at approximately 10 a.m. and parked on the south side of Chicago Avenue, facing east. After dropping off the delivery inside the store, Patterson returned to his vehicle. While standing by the driver's side of his vehicle, he heard between two to four gunshots coming from the direction of the store, so he ran into the cargo hold of his vehicle to seek shelter. Once the shooting stopped, he exited his vehicle and observed the victim holding his stomach while crossing Chicago Avenue to the north side of the street. The victim approached a vehicle parked on the north side of the street and bent down by the passenger side away from Patterson's view. A couple seconds later, the victim ran back across Chicago Avenue. Patterson then checked to determine that his partner was unharmed. Patterson never observed who shot the victim.

¶ 17        The parties then stipulated that (1) the manager of the grocery store, Iaad Hamat, would testify that there were surveillance cameras inside and outside of the store and that they were functioning properly on the day of the shooting, (2) Hamat would testify that, between 9 and 10 a.m. on May 18, 2011, a shooting occurred outside the store while he was receiving a delivery to the store and that he did not observe the shooting, and (3) Hamat would testify that the State's Exhibits Nos. 3A and 3B were videos recorded on the surveillance cameras during the shooting. The videotapes were then placed in evidence and published to the jury. Patterson testified that the videos showed him and his partner enter the store, complete the delivery, and then Patterson exit the store. The video outside the store showed Patterson then walk to the driver's side of his vehicle and later showed the victim running across Chicago Avenue after being shot.

¶ 18        On cross-examination, Patterson testified that, after the shooting, he observed a person who he did not know walk to the area near the passenger side of the parked vehicle where the victim had previously bent over and that there were a "bunch of people" outside near the crime scene within a minute or two of the shooting.

---

[3]Jimmy Puckett did not testify at trial.

## C. Sergeant Nellie Harb's Testimony

¶ 20    Sergeant Nellie Harb testified that she is a sergeant in the 17th District of the Chicago Police Department. At approximately 10 a.m. on the morning of May 18, 2011, she received a radio call of a shooting near Ayers and Chicago Avenues, so she drove to the area. As she approached from the west, she observed "a lot of people running eastbound on Chicago [Avenue]," including the victim, who was holding his chest. She stopped her vehicle to find out what happened to the victim, and he told her that he had been shot. The victim continued walking south on Chicago Avenue and then laid down near a red vehicle parked on Avers Avenue. Harb called for medical assistance, exited her vehicle, and approached the victim. She remained with him until an ambulance arrived.

## D. Larue Bey's Testimony

¶ 22    Larue Bey testified that he is a private investigator, a former sergeant in the Cook County Sheriff's Office, and a resident of the neighborhood where the crime occurred. At approximately 10 a.m. on May 18, 2011, Bey heard "quite a few gunshots" while he was standing in the kitchen of his house on the 3800 block of West Huron Street. He was not sure where the gunshots originated from, but it sounded like they came from right in front of his house. He approached his front window and observed "a red or orange Bonneville-type" vehicle traveling eastbound at a high rate of speed on Huron Street, a westbound one-way street. Bey estimated the vehicle was traveling 15 to 20 miles per hour over the 25 or 30-mile per hour speed limit.

¶ 23    The State then showed Bey the State's Exhibits 6, 7, and 8, which were all still frames from a videotape recording of the intersection of Avers and Chicago Avenues the morning of the shooting, and Bey testified that the "red or orange" vehicle depicted in all three photographs appeared to be the same vehicle that he observed through his window. Bey testified on cross-examination that he had observed the vehicle approximately 5 to 10 minutes after hearing the gunshots and that he was not sure of the make of the vehicle. The State then introduced State's Exhibit 15, which was a certified copy of vehicle records that indicated that defendant owned a 1998 Pontiac Bonneville, but it did not specify the color of the vehicle.

## E. Darian Broomfield's Testimony

¶ 25    Darian Broomfield testified that he is currently incarcerated in the IDOC for a narcotics case and that he has three prior convictions for possession of a controlled substance. Broomfield identified defendant in court and testified that he had known defendant almost his whole life, but he did denied knowing defendant by a nickname. Broomfield testified that, at approximately 10 a.m. on May 18, 2011, he was at an aid office at Pulaski Road and Ferdinand Street to obtain a Link card. He denied being on 750 block of North Avers Avenue that day.

¶ 26    Broomfield testified that, on August 20, 2011, he was arrested for a narcotics-related offense and he met detectives at the corner of Chicago and Springfield Avenues. He denied meeting with Detectives Patrick Deenihan and Patrick McDonagh at the Homan Square police station, and he denied telling them that he had observed defendant shoot the victim. The detectives showed Broomfield a photo array, but he denied that he selected a photograph of defendant as the person who shot the victim. He also denied signing his name on defendant's photograph, as well as signing an advisory form for the photo array.

¶ 27    Broomfield testified that, on April 16, 2013, he worked at the grocery store at the corner of Avers and Chicago Avenues, and that Detectives Rolando Rodriguez and John Hanichak[4] came to the store and spoke with him. The detectives "harassed [Broomfield] every day," and he denied telling them that he observed defendant shoot the victim. On May 17, 2013, Broomfield viewed a physical lineup at the police station on the 2400 block of West Belmont Avenue, and defendant was in that lineup; however, Broomfield denied that he selected defendant in the lineup as the person who shot the victim. After viewing the physical lineup, he met with Detective Rodriguez and an assistant State's Attorney. During this meeting, Broomfield signed a statement "against [his] free will" because police officers "threatened to harass [him] to make [him] lose [his] job." Broomfield testified that he did not read the statement.

¶ 28    Broomfield denied that, on May 18, 2011, he was playing dice on Avers Avenue with some people from the neighborhood. He denied that he observed the victim park his vehicle on the west side of Avers Avenue, enter the grocery store, and exit the store five minutes later. He denied observing defendant run from an alley on Chicago Avenue toward the victim and shoot the victim five or six times. Broomfield denied that defendant was standing next to him when he fired the last shot, and he denied that he became scared and ran away after the shooting. He denied that he observed defendant 20 to 30 minutes after the shooting driving a black four-door sedan one block away near Chicago and Springfield Avenues and denied that he observed defendant's face and that defendant was still wearing the same black hooded sweatshirt. Broomfield denied that he identified State's Exhibit 2 as a photograph of defendant by signing his name. Broomfield testified that, outside the presence of the detective, he told the assistant State's Attorney that the police treated him well because he did not want the offices to continue harassing him. Broomfield testified that no threats or promises were made to him in exchange for his statement and that he told the assistant State's Attorney and the detective that he provided his statement freely and voluntarily.

¶ 29    On cross-examination, Broomfield testified that he received probation for his August 20, 2011, narcotics arrest and that he never contacted the police to identify the victim's shooter in the three months from the day of the crime to the day of his arrest. On redirect-examination, Broomfield denied that, on August 20, 2011, he told Detective McDonagh (1) that he was outside playing dice, (2) that he observed the victim park his red vehicle and enter the grocery store at Avers and Chicago Avenues, (3) that he observed defendant approach the victim and begin firing a handgun as the victim exited the store, and (4) that he observed the victim fall near a Ford Taurus.

¶ 30    The State later offered Broomfield's statement into evidence and published it to the jury by instructing Detective Rolando Rodriguez to read the statement to the jury during his testimony:

> "Darian Broomfield states that he is 24 years old and that his date of birth is February 19, 1989. Darian states that he lives at *** North Harding in Chicago Illinois. Darian states that he lives with his grandmother Fannie Broomfield and his grandfather Curtis Broomfield.
>
> Darian states that he was born in Chicago and that he has lived at *** North Harding his entire life. Darian states that he went to Orr High School in Chicago but did not graduate. Darien states that he received his GED in 2012.

_____

[4]Detective John Hanichak did not testify at trial.

- 6 -

Darian states that on May 18, 2011 he was on Avers Avenue and Chicago with some guys from the neighborhood playing dice. Darian states that he was on the east side of Avers Avenue north of the alley but south of [the grocery store].

Darian states that he was playing dice for about one hour when he saw a guy from the neighborhood named Bruce Lee turn off Chicago Avenue and drive south on Avers Avenue and park his car on the west side of the street. Darian has identified a photo marked Exhibit No. 1 as a picture of Bruce Lee by signing his name.

Darian states that he has known Bruce Lee from the neighborhood for more than five years. Darian states that no one else was in the car with him. Darian states that Bruce Lee got out of the car, he crossed Avers, and walked into [the grocery store]. Darian states that [the grocery store] is on the east side of Avers.

Darian states that about five minutes later Bruce Lee walked out of [the grocery store] and he was starting to cross over Avers Avenue back to his car. Darian states at that time he saw a man he knows as Ronnie run out of the alley from the east side of Avers towards Bruce Lee.

Darian has identified a photo marked Exhibit No. 2 as a picture of Ronnie by signing his name. Darian states that he does not know Ronnie's real name. Darian states that he has known Ronnie from the neighborhood for five or six years. Darian states that when Ronnie came running out of the alley he had a gun in his right hand.

Darian states that he was about 10 feet away from Ronnie when he came running out of the alley. Darian states that Ronnie was wearing a black hoodie but with the hood up, but he knew it was Ronnie because he could still see his face.

Darian states that a hoodie is a sweatshirt with a hood on it. Darian states that it was light out and nothing was in his way of seeing Ronnie. Darian states that Ronnie was running straight at Bruce Lee and started firing his gun at Bruce Lee.

Darian states that he saw Ronnie shoot the gun at Bruce Lee five or six times. Darian states that Ronnie was running at Bruce Lee the entire time he was shooting the gun and that he came up right next to Bruce Lee when he fired the last shot.

Darian states that after he saw Ronnie shoot Bruce Lee he got scared and ran to the alley on Avers south of Chicago Avenue and ran westbound towards Springfield. Darian states that he was running down the alley towards Springfield. He saw Ronnie run down the alley at Avers south of Chicago Avenue and run eastbound towards Hamlin, the same place where he originally saw Ronnie—originally saw Ronnie come from with the gun in his hand.

Darian states that he waited a couple of minutes and he went back to Avers to see if Bruce Lee was okay, and he could tell that he was not.

Darian states that about 20 to 30 minutes later after the shooting he saw Ronnie about one block away at Chicago and Springfield driving a black four-door sedan. Darian states that he could see Ronnie's face and he was still wearing the same black colored hoodie.

Darian Broomfield states that he has been treated well by [the assistant State's Attorney] and by the police. Darian states that [the assistant State's Attorney] asked Detective Rodriguez to leave the room and asked Darian how he had been treated by

the police. Darian states that he told [the assistant State's Attorney] that they treated me good.

Darian states that he was allowed to use the restroom when he needed. Darian states that he has been given food and water while at the Area North police station, specifically a bag of chips and bottled water.

Darian states that he has not been handcuffed at any time while at Area North police station. Darian states that no threats or promises have been made to him to make this statement. Darian states that this statement was given freely and voluntarily. Darian states that he is not under the influence of drugs or narcotics at this time.

Darian states that he can read and write English and that he demonstrated this by reading the first page of this statement out loud and then followed along with [the assistant State's Attorney]—followed along as [the assistant State's Attorney] read the rest of the statement as he read along and was told to initial any changes and then sign the bottom of each page to show it was accurate.

Darian states that he was allowed to make corrections to the statement.

Darian states that [the assistant State's Attorney] offered to have him give his statement on camera so there would be a video recording of his statement. Darian states that he told [the assistant State's Attorney] that he did not want to be videotaped and that he would rather have his statement typed out so he could read it and make changes.

Darian states that everything in this statement is true and accurate ***."

¶ 31                          F. Sergeant Patrick McDonagh's Testimony

¶ 32        Sergeant Patrick McDonagh testified that, in May of 2011, he was a detective assigned to investigate the shooting. On August 20, 2011, officers in the narcotics investigation unit told him that they interviewed a man who claimed to witness the shooting, and Sergeant McDonagh interviewed Broomfield at the Homan Square police station later that day. Broomfield told Sergeant McDonagh that, on the day of the shooting, he was playing dice with some other people outside the grocery store at Avers and Chicago Avenues when he observed the victim exit his Ford Taurus and enter the store. As the victim exited the store and returned to his vehicle, he observed a man named "Ronnie" begin shooting the victim. After the shooting, the victim stumbled back to the south side of Chicago Avenue and fell near his vehicle. To determine Ronnie's identity, Sergeant McDonagh presented Broomfield a photo array, and Broomfield identified a photograph of defendant as Ronnie. Sergeant McDonagh had Broomfield sign defendant's photograph to verify that Broomfield identified defendant as the person he observed shoot the victim, and he observed Broomfield sign the form. Sergeant McDonagh and Broomfield both signed a photo array advisory form, and the State presented both the photo array and the advisory form at trial as State's Exhibits 14A and 14B.

¶ 33        Sergeant McDonagh also testified that he viewed video recorded on a security camera from an apartment building located on the 700 block of North Hamlin Avenue. The video showed a tall man, dressed in black, running eastbound in the alley south of Chicago Avenue, approximately five blocks south of the camera's location. He viewed the video "[a] handful of times" but he was unable to observe the face or determine the age of the man in the video. Sergeant McDonagh and a police technician attempted to recover the video; however, the video was never recovered because police could not locate the owner of the apartment

building, who was the only person with the access code to download the video off of the hard drive.

### G. Officer Victor Rivera's Testimony

Officer Victor Rivera testified that he is a forensic investigator who processed the crime scene at approximately 11 a.m. on May 18, 2011. There, he recovered five cartridge cases and one fired bullet near a red Taurus parked on the street. There was a pair of jeans on the ground, and inside the pockets, he recovered several small plastic bags that displayed different emblems on them. The next day, he received from the Cook County medical examiner's office a bullet fragment that had been recovered from the victim's body.

On cross-examination, Officer Rivera testified that one of the plastic bags he recovered from the jeans contained smaller plastic bags with a Batman emblem. He also recovered from the victim's jeans pocket another plastic bag that contained smaller plastic bags with an ace of spade emblem on them. Officer Rivera testified that—based on his background, training, and experience—this type of packaging of small plastic bags in a larger bag indicated that the bags contained a controlled substance and that, if a person has a large plastic bag containing smaller plastic bags, then that is an indication that the person is a drug dealer.

### H. Lisa Gilbert's Testimony

Lisa Gilbert testified that she is a latent fingerprint examiner for the Illinois State Police, and that she performed a latent fingerprint examination on two glass bottles and five shell casings that were recovered from the crime scene; however, she was unable to locate any fingerprints suitable for testing. She testified that, although she could not locate fingerprints suitable for testing, this did not mean that no one had touched the items.

### I. Stipulated Testimony

Before the State called its final witness, the parties stipulated that Jennifer Hanna, if called to testify, would testify that she is a forensic scientist with the Illinois State Police and that she performed an examination of the five Federal nine-millimeter Luger cartridge casings recovered from the scene and she determined that they were all fired from the same firearm. Hanna would also testify that she performed an examination of the bullets recovered from the crime scene and from the victim's body but she could not determine whether those bullets were fired from the same firearm.

The parties also stipulated that Dr. J. Lawrence Cogan, if called to testify, would testify that he was an assistant Cook County medical examiner, and that "on May 19, 2011, he received the body of [the victim] and assigned it Medical Examiner Number 261 May 2011." Dr. Cogan performed the autopsy on the victim's body; discovered gunshot wounds to the back, upper chest, right forearm, and right thigh; and determined that none of the wounds indicated the shooting occurred at a close range. Dr. Cogan would testify that the cause of the victim's death was multiple gunshot wounds and that the manner of death was a homicide. The parties stipulated that Dr. Cogan prepared a protocol detailing his findings and a certified copy of the protocol, which was admitted into evidence, refers to the victim as Bruce Lee, Jr., and the case number as "261 May 2011."

¶ 42    Additionally, the parties stipulated that the Chicago police arrested Broomfield on August 20, 2011, on a narcotics case but released him without charges, and that he is currently in the custody of the IDOC but is free on work release.

¶ 43                      J. Detective Rolando Rodriguez's Testimony

¶ 44    The State's final witness, Detective Rolando Rodriguez, testified that he was assigned to investigate the shooting and that he interviewed Broomfield on April 16, 2013, outside of the grocery store at Avers and Chicago Avenues. Detective Rodriguez interviewed Broomfield again on May 17, 2013, and Broomfield agreed to view a physical lineup, so Detective Rodriguez drove him to the police station on the 2400 block of West Belmont Avenue, where Broomfield viewed the lineup and identified defendant as the person who shot the victim. Detective Rodriguez then contacted an assistant State's Attorney, who came to the police station to memorialize a statement from Broomfield. Detective Rodriguez testified that he never threatened, harassed, or promised anything to Broomfield when he spoke to him on April 16, 2013, or May 17, 2013, and that, when Detective Rodriguez interviewed him, Broomfield told him that defendant was the person who shot the victim.

¶ 45    After Detective Rodriguez's testimony, the State rested, and the trial court denied defendants' motion for a directed verdict.

¶ 46                      K. Detective Patrick Deenihan's Testimony

¶ 47    Next, the defense called its sole witness, Detective Patrick Deenihan, who testified that, on August 20, 2011, he interviewed Broomfield, who told him that he was playing dice during the shooting, and that Broomfield did not say that defendant was close to the victim when he fired the final shot. Detective Deenihan also interviewed Butler on the day of the shooting, and she told him that, earlier that morning, the victim told her that he was leaving the house to sell marijuana to someone at the corner of Avers and Chicago Avenues. Butler told the victim that she wanted to accompany him but he told her that he did not want her to because he had been shot at before and he did not want her to be in danger. On cross-examination, Detective Deenihan testified that Broomfield told him that he observed the victim enter the store at Avers and Chicago Avenues, and when the victim exited the store, defendant shot the victim five or six times.

¶ 48                              IV. Jury Instructions

¶ 49    At the defense's request, the trial court agreed to provide the jury with a nonpattern jury instruction concerning the video recorded on the surveillance camera at the apartment building on the 700 block of North Hamlin Avenue. That instruction provided that:

       "If he [*sic*] People in this case have failed to preserve evidence within their power to preserve, you may infer that the evidence would be adverse to the People if you believe each of the following:

       1. The evidence was under the control of the People and could have been preserved by the exercise of reasonable diligence.

       2. The evidence was not equally available to the defendant.

       3. A reasonably prudent person under the same or similar circumstances would have preserved the evidence if he believed it to be favorable to him.

4. No reasonable excuse for the failure has been shown."

## V. Closing Arguments

The State began its closing argument by claiming that "[f]or 28 years, the victim in this case was known as Bruce Lee. But, on May 18th, 2011, he was given a new name, 261 May 2011." Later, the State discussed Broomfield's testimony and argued that "[f]or two years, [Broomfield] cooperated with the police and was consistent. The one time that he changes his story is when he's up there on the witness stand face-to-face with his killer." The State added that "[n]o one knows why [Broomfield] said what he said two days ago. Is he—maybe because he's considered a snitch, maybe because he didn't want to be here testifying, maybe because he's scared, maybe." The State concluded its argument by asking the jury to

> "[t]ell [defendant] he doesn't get to decide who lives and who dies. We have a cold-blooded killer sitting before you today, ladies and gentlemen. Don't let him walk out those doors."

In response, the defense then claimed that Broomfield was not a credible witness, arguing that his story had changed and that he had multiple arrests and convictions. The defense pointed out that Broomfield did not tell the police that defendant was the shooter until he was arrested for a narcotics offense on August 20, 2011, after which he was released without charges. The defense argued that Broomfield identified defendant to the police because it provided him a "get-out-of-jail free card." The defense also questioned why there were no additional eyewitnesses, arguing

> "once the first shot occurs, everybody who's there is going to be alert. So, all these people are playing dice with him. *** They would have seen the same thing. They got nobody. There's nobody here but *** B[r]oomfield."

During rebuttal, the State again argued that, on the day of the shooting, the victim's "name was changed from Bruce Lee to a number. It's this, No 261 May 11. Another dead body in the City of Chicago." The State further claimed that defendant "decided exactly when he was going to take away [the victim's] name." The State also argued that "the other witnesses just like *** Broomfield, they don't want to be found. They don't want to be cooperative with police."

## VI. Conviction and Sentencing

On May 14, 2015, the jury found defendant guilty of first degree murder and personally discharging a firearm. On July 28, 2015, the trial court denied defendant's motion for a new trial notwithstanding the verdict. After considering factors in aggravation and mitigation, the trial court sentenced defendant to a total of 51 years in the IDOC. Defendant now appeals his conviction.

## ANALYSIS

On appeal, defendant argues that his conviction should be reversed, claiming that (1) the trial court improperly defined the reasonable doubt standard of proof prior to trial, (2) the State made inappropriate comments during closing arguments, (3) the evidence at trial was insufficient to prove defendant guilty beyond a reasonable doubt, and (4) cumulative errors warranted a reversal of defendant's conviction. For the following reasons, we affirm

defendant's conviction.

¶ 58                                    I. Preliminary Jury Instructions

¶ 59        Defendant first claims that his conviction should be reversed because the trial court erred when it improperly compared the standard of proof in a criminal case to the "preponderance of the evidence" standard in civil cases, which resulted in a reasonable likelihood that the jury convicted defendant on a burden of proof less than the "beyond a reasonable doubt" standard. In response, the State argues that the trial court's statements were not improper and that the trial court properly instructed the jury concerning the State's burden of proof. For the following reasons, we find that the trial court did not err.

¶ 60        As an initial matter, defendant concedes that the defense did not object to the preliminary jury instruction at trial and asks us to review the issue under the plain-error doctrine. To preserve an alleged error for review, a defendant must both specifically object at trial and raise the specific issue again in a written posttrial motion. *People v. Thompson*, 238 Ill. 2d 598, 611-12 (2010). The plain-error doctrine contained in Illinois Supreme Court Rule 615(a) provides a narrow exception to the general rule of procedural default. *People v. Walker*, 232 Ill. 2d 113, 124 (2009). Our supreme court explained: "[T]he plain-error doctrine allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007) (citing *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005)). The burden of persuasion remains with the defendant under both prongs of the plain-error test. *People v. Naylor*, 229 Ill. 2d 584, 593 (2008). However, the first step of plain-error review is to determine whether any error occurred. *Piatkowski*, 225 Ill. 2d at 565.

¶ 61        Illinois Supreme Court Rule 431(b) requires the trial court to "ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her." Ill. S. Ct. R. 431(b) (eff. July 1, 2012). A jury instruction is unconstitutional if there is a reasonable likelihood that the jury understood the instruction to allow conviction without proof beyond a reasonable doubt. *Tyler v. Cain*, 533 U.S. 656, 658 (2001) (citing *Cage v. Louisiana*, 498 U.S. 39, 41 (1990)). Illinois is among the jurisdictions that do not define reasonable doubt and our supreme court has "long and consistently held that neither the trial court nor counsel should define reasonable doubt for the jury." *People v. Downs*, 2015 IL 117934, ¶ 19. The rationale behind this rule is that "reasonable doubt" is self-defining and needs no further definition. *Downs*, 2015 IL 117934, ¶ 19. Additionally, Illinois Pattern Jury Instructions, Criminal, No. 2.05 (4th ed. 2000) (hereinafter IPI Criminal 4th No. 2.05), provides no definition of reasonable doubt and instead contains a Committee Note stating that " '[t]he Committee recommends that no instruction be given defining the term "reasonable doubt." ' " *Downs*, 2015 IL 117934, ¶ 20 (quoting IPI Criminal 4th No. 2.05, Committee Note). Generally, jury instructions are reviewed under an abuse-of-discretion standard; however, our review is *de novo* when the

issue concerns whether the jury instruction correctly conveyed the applicable law. *People v. Turman*, 2011 IL App (1st) 091019, ¶ 18 (citing *Barth v. State Farm Fire & Casualty Co.*, 228 Ill. 2d 163, 170 (2008)). *De novo* consideration means we perform the same analysis that a trial judge would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011).

¶ 62    We cannot say that a clear or obvious error occurred when the trial court instructed the jury on the reasonable doubt standard. Prior to *voir dire*, the trial court addressed the venire on basic principles of law, including the charges against defendant, the nature of the indictment, the presumption of innocence, and the State's burden of proof, stating that its preliminary instructions were necessary to assist the eventual jurors in "follow[ing] the law and evidence in this case." Specifically, the trial court told the venire:

> "These are not your final or complete instructions. Those will come after you've heard all the evidence and the final arguments of the attorneys. When the time for giving instructions come [*sic*], I will first read them to you, and then you'll get them in writing ***.

> * * *

> The next constitutional principle I want to talk to you about is the burden of proof. In a criminal case, the burden of proof is proof beyond a reasonable doubt. Some of you may have sat on civil juries, there the burden of proof is preponderance of evidence, and if you look at a scale, all you have to do is tilt it. And the definition is it's more likely than not that the event occurred, that's preponderance of the evidence.

> In a criminal case, again, proof beyond a reasonable doubt is the highest burden of proof at law.

> Does anybody have any problems understanding the burden of proof being beyond a reasonable doubt? Please raise their hand.

> Indicating no one raised their hand."

The trial court's comments clearly and accurately stated the law by first identifying that the burden of proof was beyond a reasonable doubt, then distinguishing it from the lesser standard of proof in civil cases, and finally concluded by emphasizing that reasonable doubt it the highest standard of proof at law. We cannot say that the trial court's comments created a reasonable likelihood that the jury convicted defendant on a standard of proof less than beyond a reasonable doubt. As a result, we cannot say that the trial court committed an error in its preliminary jury instructions.

¶ 63    In *People v. Johnson*, 2013 IL App (1st) 111317, the defendant claimed that the trial court erred when it attempted to define "reasonable doubt" during *voir dire*. In that the case, the trial court told the venire:

> " 'The State has the burden of proof beyond a reasonable doubt. In Illinois we do not—it is not defined by the Supreme Court or by the State legislature. That's something for you to decide. But if any of you have served on a civil jury, if you use the analogy of a scale, all you have to do is tilt it. And that's proof beyond a preponderance of the evidence.

> In a criminal case, if you use the same scale, it's a balance like this. (Indicating.) Proof beyond a reasonable doubt is the highest burden that there is at law in Illinois and the United States.' " *Johnson*, 2013 IL App (1st) 111317, ¶ 52.

On appeal, we found that, "[a]lthough we do not condone the reference and comparison to the civil standard," the trial court's comments did not constitute error where it told the venire that reasonable doubt was the highest burden of proof at law and that it was for them to decide what reasonable doubt meant. *Johnson*, 2013 IL App (1st) 111317, ¶ 54.

¶ 64    In this case, the trial court made comments similar to the trial court in *Johnson*. Here, the trial court began by instructing the venire that "[i]n a criminal case, the burden of proof is proof beyond a reasonable doubt." The trial court then distinguished the burden of proof in civil cases as a comparison: "Some of you may have sat on civil juries, there the burden of proof is preponderance of evidence, and if you look at a scale, all you have to do is tilt it. And the definition is it's more likely than not that the event occurred, that's preponderance of the evidence." To further illustrate the difference in the burden of proof, the trial court then turned back to the reasonable-doubt standard in criminal cases: "In a criminal case, again, proof beyond a reasonable doubt is the highest burden of proof at law." The trial court then asked the venire if anyone had difficulty understanding the burden of proof being beyond a reasonable doubt, and no one raised his or her hand. The trial court was clear in its comments when it was explaining the burden of proof in a civil case and when it was referring to the burden of proof in criminal cases. The trial court was also unambiguous when it explained that the reasonable-doubt standard of proof in criminal cases "is the highest burden of proof at law," and it ensured that none of the prospective jurors were confused by the instruction by asking anyone who did not understand to raise his or her hand, which no one did. As a result, we cannot say that the trial court committed a clear or obvious error in its preliminary instructions to the jury concerning the standard of proof beyond a reasonable doubt.

¶ 65    Defendant argues that the trial court deprived defendant of his due process rights because its preliminary jury instructions defined reasonable in a manner such that there was a reasonable likelihood that the jury convicted him on a lesser standard of proof. In support, defendant relies heavily on a federal case from the Northern District of Illinois, *Adorno v. Pierce*, No. 14 C 00791, 2016 WL 1719788, at *1 (N.D. Ill. Apr. 29, 2016), in which the defendant petitioned for *habeas corpus* relief from his conviction in Illinois state court. In that case, the trial court told the venire the following:

> " 'Illinois does not define reasonable doubt, but any of you who may have sat on a civil jury there's a preponderance of the evidence, reasonable doubt is the highest burden of proof in our country and in our State. Those of you who may have sat on civil cases, preponderance of the evidence, if you look at this like a scale, all you have to do is tilt it. So the definition of preponderance of the evidence is, it's more likely than not that the event occurred.
>
>     Again, Illinois does not define reasonable doubt. That's up for you to decide in words, but in analogy to the scale thing, you would have to tip it like this, so that would be some insight into what proof beyond a reasonable doubt would be.' " *Adorno*, 2016 WL 1719788, at *2.

At the conclusion of trial, the jury found defendant guilty, and the Illinois Appellate Court affirmed the conviction, finding that, although the trial court's comments on the meaning of reasonable doubt was improper, the remarks did not deprive him of due process. *Adorno*, 2016 WL 1719788, at *2 (citing *People v. Adorno*, 2013 IL App (1st) 110028-U). The Illinois Supreme Court denied defendant's petition for leave to appeal, and defendant then filed a

petition for a writ of *habeas corpus* in federal court. *Adorno*, 2016 WL 1719788, at *3. The federal court granted defendant's petition, finding that:

> "[t]he trial judge invoked the preponderance-of-the-evidence standard but failed to distinguish it from proof beyond a reasonable doubt. Indeed, the trial judge never said outright that the preponderance standard does not apply in criminal cases. If he intended to use the preponderance standard merely as a comparative baseline, he did not finish the thought." *Adorno*, 2016 WL 1719788, at *11.

¶ 66    However, after the parties concluded briefing in the instant case, the Seventh Circuit Court of Appeals reversed the district court's order granting *habeas* relief, finding that "the judge's remarks do not suggest that the jurors would have understood that they were free to convict Adorno on less than proof beyond a reasonable doubt." *Adorno v. Melvin*, 876 F.3d 917, 922 (7th Cir. 2017). The Seventh Circuit further found that the trial court "invoked the civil standard solely for the purpose of distinguishing it from the criminal reasonable-doubt standard, explaining that proof by preponderance of the evidence is insufficient for criminal cases." *Adorno*, 876 F.3d at 922. The Seventh Circuit also explained that the trial court emphasized that reasonable doubt was the highest burden of proof at law, and the trial court, at the close of trial, "formally instructed the jury on the presumption of innocence, the elements of the offense, and the state's burden to prove each of the elements beyond a reasonable doubt." *Adorno*, 876 F.3d at 922.

¶ 67    Moreover, *Adorno* is factually distinguishable from the case at bar. In that case, the trial court went back and forth between discussing reasonable doubt and preponderance of the evidence several times, even at one point discussing both standards within the same sentence. *Adorno*, 2016 WL 1719788, at *2. Here, the trial court was clearer in its comments: it first instructed the jury that reasonable doubt was the burden of proof, then it contrasted reasonable doubt with the preponderance of the evidence standard, and finally it concluded by emphasizing that reasonable doubt is the highest standard of proof at law. Additionally, the *Adorno* court instructed the jury that reasonable doubt was up to them to decide in words, and it used a scale analogy to explain reasonable doubt by physically demonstrating the tilting of a scale to meet the burden of proof. *Adorno*, 2016 WL 1719788, at *2. In this case, the trial court avoided this potential confusion since it did not tell the jury that it was up to them to determine what reasonable doubt means. The trial court in this case also did not use a scale analogy or physically demonstrate the tilting of the scale to show how it would reach the reasonable doubt burden of proof. Instead, the trial court here used the scale analogy to define preponderance of the evidence to explain how that standard of proof differs from reasonable doubt, which the trial court emphasized is the highest burden of proof at law. As a result, *Adorno* is factually distinguishable from the case at bar, and the trial court did not err in its preliminary jury instructions.

¶ 68    Defendant follows up his discussion of *Adorno* by citing an unpublished appellate court case, *People v. Pledge*, 2016 IL App (1st) 132200-U, ¶ 44, which affirmed the defendant's conviction, finding that the trial court did not err when it used a scale analogy to instruct the jury on reasonable doubt burden of proof. However, Illinois Supreme Court Rule 23(e)(1) states that unpublished orders are "not precedential and may not be cited by any party except to support contentions of double jeopardy, *res judicata*, collateral estoppel or law of the case." Ill. S. Ct. R. 23(e)(1) (eff. July 1, 2011). See *People v. Tatum*, 389 Ill. App. 3d 656, 666 (2009)

(finding it improper for the defendant to cite an unpublished Rule 23 order). As a result, we need not consider *Pledge* since it has no precedential value.

¶ 69    Defendant also argues that reviewing courts in Illinois have routinely found that trial courts commit prejudicial error when they attempt to define reasonable doubt, citing several cases in support: *Turman*, 2011 IL App (1st) 091019, ¶ 25; *People v. Franklin*, 2012 IL App (3d) 100618, ¶ 28; *Downs*, 2015 IL 117934, ¶¶ 23-24; *People v. Jenkins*, 89 Ill. App. 3d 395, 397 (1980); and *People v. Speight*, 153 Ill. 2d 365, 374 (1992). However, each of these cases is distinguishable from the case at bar. In *Turman*, the jurors had been deliberating for several hours when they asked the trial court for a " 'more explicit, expansive definition of reasonable doubt.' " *Turman*, 2011 IL App (1st) 091019, ¶ 19. The trial court responded to the jury that " 'reasonable doubt is not defined under Illinois law. It is for the jury to collectively determine what reasonable doubt is.' " *Turman*, 2011 IL App (1st) 091019, ¶ 19. On appeal, the appellate court found that the trial court erred in its explanation of reasonable doubt to the jury, explaining that, "[b]y instructing the jurors that they should collectively determine what reasonable doubt was, the [trial] court allowed the jury to use a standard that in all likelihood was below the threshold of a reasonable doubt standard." *Turman*, 2011 IL App (1st) 091019, ¶ 25. The instant case is factually dissimilar because, unlike *Turman*, the trial court never told the jury that it was up to them to determine what reasonable doubt means. Instead, the trial court in this case distinguished the burden of proof from civil cases and explained to the jury that the reasonable doubt standard is not only higher than the preponderance of evidence standard in civil cases, but the highest burden of proof at law.

¶ 70    In *Franklin*, the trial court instructed the potential jurors that " '[b]eyond a reasonable doubt means beyond a reasonable doubt. It's what each of you individually and collectively, as 12 of you, believe is beyond a reasonable doubt.' " *Franklin*, 2012 IL App (3d) 100618, ¶ 4. On appeal, the appellate court found that the trial court's instruction to potential jurors was constitutionally deficient because, "by telling jurors that it was for them to collectively determine what reasonable doubt meant, there [was] a reasonable likelihood that the jurors understood the instruction to allow a conviction based on proof less than a reasonable doubt." *Franklin*, 2012 IL App (3d) 100618, ¶ 28. Again, the case at bar is factually distinguishable because, here, the trial court never instructed the venire that it would be up to them to decide how to define reasonable doubt and instead instructed them that reasonable doubt was the highest standard of proof at law. Since the trial court in this case did not instruct the jury to create its own definition of reasonable doubt, there was not a reasonable likelihood that the jurors convicted defendant on a burden of proof less than a reasonable doubt. Defendant also acknowledges that, in *Downs*, our supreme court abrogated *Turman* and *Franklin*, finding that simply instructing jurors that they must determine the meaning of reasonable doubt is not reversible error *per se*. *Downs*, 2015 IL 117934, ¶¶ 23-24.

¶ 71    In *Jenkins*, the trial court attempted to explain the meaning of reasonable doubt to potential jurors in an analogy to a glass of water with a rubber band on it. *Jenkins*, 89 Ill. App. 3d at 396-97. The trial court explained that the rubber band represented reasonable doubt and a small chip of wood at the bottom of the glass represented the defendant, and that the State needed to fill the glass with enough water (presumably meaning evidence) to lift the wood chip (defendant) above the line of reasonable doubt (rubber band). *Jenkins*, 89 Ill. App. 3d at 396-97. On appeal, the appellate court reversed defendant's conviction, finding that the trial court erred in using a "patently misleading" analogy to a glass of water that "emphasized the

- 16 -

quantity of evidence introduced by the State without taking into account the evidence introduced by the defendant or the credibility of the witnesses." *Jenkins*, 89 Ill. App. 3d at 398. In the instant case, the trial court did not analogize the reasonable doubt standard in an attempt to define it, and it never made a physical demonstration indicating a quantity of evidence required to meet the reasonable doubt burden of proof, as the *Johnson* court did. *Johnson*, 2013 IL App (1st) 111317, ¶ 52. Instead, the trial court distinguished the reasonable-doubt standard in criminal cases from the preponderance of the evidence standard in civil cases and instructed the court the reasonable-doubt standard is the highest burden of proof at law.

¶ 72　　In *Speight*, the State instructed the jury that reasonable doubt means " 'a doubt that has to be substantial.' " (Emphasis omitted.) *Speight*, 153 Ill. 2d at 374. The trial court immediately sustained the defense's objection, and told the jury that it would tell them what the law is and that the State's definition was incorrect. *Speight*, 153 Ill. 2d at 374. Our supreme court found that the defendant was not prejudiced by the State's error, since the trial court admonished the jury to disregard the improper statement and then properly instructed them on reasonable doubt. *Speight*, 153 Ill. 2d at 375. The case at bar is distinguishable, since the trial court neither referred to reasonable doubt as a "substantial" doubt, nor attempted to define it using other terms. Instead, the trial court correctly stated that reasonable doubt was the highest standard of proof at law.

¶ 73　　As a result, we cannot say that the trial court committed a clear or obvious error in its preliminary instructions to the jury concerning the standard of proof beyond a reasonable doubt.

¶ 74　　　　　　　　　　II. Remarks During Closing Arguments

¶ 75　　Defendant next claims that the State made prejudicial remarks during closing arguments that denied him a fair trial. Specifically, defendant argues that the State (1) inflamed the passions of the jury by referring to the victim as Chicago's 261st homicide victim of 2011, (2) implied that Broomfield's testimony at trial was the product of threats and intimidation by defendant, (3) suggested that additional witnesses did not come forward due to community hostility towards the police, and (4) led the jury to believe that defendant was in custody during trial. Defendant claims that his conviction should be reversed because the jury would not have found him guilty had the State not made the improper remarks. In response, the State argues that the comments made during closing argument did not deny defendant a fair trial as they were either based on the evidence or were in response to the defense's argument. For the following reasons, we find that the State's arguments were not prejudicial.

¶ 76　　Defendant asks this court to review the State's remarks during closing argument under the plain-error doctrine, since the defense neither objected at trial, nor raised the issue in posttrial motion. As stated, the plain-error doctrine allows a reviewing court to consider unpreserved claims of error when " '(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence.' " *Thompson*, 238 Ill. 2d at 613 (quoting *Piatkowski*, 225 Ill. 2d at 565). Under plain-error review, the burden of persuasion remains with the defendant, and the first step is to determine whether any error occurred. *Thompson*, 238 Ill. 2d at 613.

¶ 77    " 'The purpose of closing arguments is to give the parties a final opportunity to review with the jury the admitted evidence, discuss what it means, apply the applicable law to that evidence, and argue why the evidence and law compel a favorable verdict.' " *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005) (quoting Thomas A. Mauet, Trial Evidence § 14.1, at 439 (2d ed. 2001)). A defendant "faces a substantial burden in attempting to achieve reversal of his conviction based upon improper remarks made during closing argument." *People v. Moore*, 358 Ill. App. 3d 683, 693 (2005) (citing *People v. Williams*, 332 Ill. App. 3d 254, 266 (2002)). "The State is afforded a great deal of latitude in presenting closing argument and is entitled to argue all reasonable inferences from the evidence." *Moore*, 358 Ill. App. 3d at 693 (citing *People v. Nieves*, 193 Ill. 2d 513, 532-33 (2000)). It is well established that the State may discuss the witnesses and their credibility during closing argument and that it may assume the truth of the State's evidence. *People v. Anderson*, 95 Ill. App. 3d 492, 496 (1981). It is improper for the State "to do or say anything in argument the only effect of which will be to inflame the passion or arouse the prejudice of the jury against the defendant, without throwing any light on the question for decision." *People v. Smith*, 141 Ill. 2d 40, 60 (1990). It is also improper when the remarks misstate the evidence or argue facts not in evidence. *People v. Chavez*, 327 Ill. App. 3d 18, 27 (2001) (citing *People v. Albanese*, 104 Ill. 2d 504, 519 (1984)). Improper comments during closing argument can constitute reversible error "only when they engender substantial prejudice against defendant such that it is impossible to say whether or not a verdict of guilty resulted from those comments." *Moore*, 358 Ill. App. 3d at 693 (citing *Nieves*, 193 Ill. 2d at 533). The reviewing court must consider the closing argument in its entirety, and the alleged improper remarks must be considered in their proper context. *Nicholas*, 218 Ill. 2d at 122.

¶ 78    It is not clear whether the appropriate standard of review for this issue is *de novo* or abuse of discretion. We have previously made this same observation in several cases, including *People v. Sandifer*, 2016 IL App (1st) 133397, ¶ 54 ("The standard of review for closing arguments is currently unclear."); *People v. Alvidrez*, 2014 IL App (1st) 121740, ¶ 26; *People v. Land*, 2011 IL App (1st) 101048, ¶¶ 148-51; and *People v. Phillips*, 392 Ill. App. 3d 243, 274-75 (2009). The Second District Appellate Court has agreed with our observation that the standard of review for closing remarks is an unsettled issue. *People v. Burman*, 2013 IL App (2d) 110807, ¶ 26; *People v. Robinson*, 391 Ill. App. 3d 822, 839-40 (2009).

¶ 79    The confusion stems from an apparent conflict between two Illinois Supreme Court cases: *People v. Wheeler*, 226 Ill. 2d 92, 121 (2007), and *People v. Blue*, 189 Ill. 2d 99, 132 (2000). In *Wheeler*, our supreme court held: "Whether statements made by a prosecutor at closing argument were so egregious that they warrant a new trial is a legal issue this court reviews *de novo*." *Wheeler*, 226 Ill. 2d at 121. However, our supreme court in *Wheeler* cited with approval *Blue*, in which our supreme court had previously applied an abuse-of-discretion standard. *Wheeler*, 226 Ill. 2d at 121. In *Blue* and numerous other cases, our supreme court had held that the substance and style of closing argument is within the trial court's discretion and that the trial court's decision will not be reversed absent an abuse of discretion. *Blue*, 189 Ill. 2d at 132 ("we conclude that the trial court abused its discretion" by permitting certain prosecutorial remarks in closing); *People v. Caffey*, 205 Ill. 2d 52, 128 (2001); *People v. Emerson*, 189 Ill. 2d 436, 488 (2000); *People v. Williams*, 192 Ill. 2d 548, 583 (2000); *People v. Armstrong*, 183 Ill. 2d 130, 145 (1998); *People v. Byron*, 164 Ill. 2d 279, 295 (1995). Our supreme court had reasoned: "Because the trial court is in a better position than a reviewing

court to determine the prejudicial effect of any remarks, the scope of closing argument is within the trial court's discretion." *People v. Hudson*, 157 Ill. 2d 401, 441 (1993). Following *Blue* and other Illinois Supreme Court cases like it, this court had consistently applied an abuse-of-discretion standard. *People v. Tolliver*, 347 Ill. App. 3d 203, 224 (2004); *People v. Abadia*, 328 Ill. App. 3d 669, 678 (2001).

¶ 80   Since *Wheeler*, appellate courts have been divided regarding the appropriate standard of review. *People v. Henderson*, 2017 IL App (1st) 142259, ¶ 236 (noting that the issue remains divided). The first and third divisions of the First District have applied an abuse-of-discretion standard, while the Third and Fourth Districts and the fifth division of the First District have applied a *de novo* standard of review. Compare *People v. Love*, 377 Ill. App. 3d 306, 313 (2007), and *People v. Averett*, 381 Ill. App. 3d 1001, 1007 (2008), with *People v. McCoy*, 378 Ill. App. 3d 954, 964 (2008), *People v. Palmer*, 382 Ill. App. 3d 1151, 1160 (2008), *People v. Ramos*, 396 Ill. App. 3d 869, 874 (2009), and *People v. Vargas*, 409 Ill. App. 3d 790, 797 (2011).

¶ 81   However, we do not need to resolve the issue of the appropriate standard of review at this time because our holding in this case would be the same under either standard. This is the same approach that we took in *Sandifer* and *Alvidrez* and the same approach taken by the Second District in its *Burman* and *Robinson* opinions. *Sandifer*, 2016 IL App (1st) 133397, ¶ 55 (declining to choose a standard of review and finding that it "need not resolve the appropriate standard of review because" under either standard the "holding is identical"); *Alvidrez*, 2014 IL App (1st) 121740, ¶ 26; *Burman*, 2013 IL App (2d) 110807, ¶ 26; *Robinson*, 391 Ill. App. 3d at 840.

¶ 82   We cannot say that the State committed a clear or obvious error in its remarks during closing argument. The State began closing argument telling the jury that, "[f]or 28 years, the victim in this case was known as Bruce Lee. But, on May 18th, 2011, he was given a new name, 261 May 2011." During rebuttal, the State again argued that, after the shooting, "[the victim's] name was changed from Bruce Lee to a number. It's this, No 261 May 11. Another dead body in the City of Chicago." The State later claimed that defendant "decided exactly when he was going to take away [the victim's] name."

¶ 83   These comments were not improper because they were based on the evidence presented at trial. Specifically, the parties stipulated that Dr. Cogan, an assistant Cook County medical examiner who performed the autopsy on the victim, would testify that, "on May 19, 2011, he received the body of [the victim] and assigned it Medical Examiner Number 261 May 2011." A certified copy of Dr. Cogan's protocol, detailing his findings, which was admitted into evidence at trial, refers to the victim as Bruce Lee, Jr., and the case number as "261 May 2011." The State argued, essentially, that defendant shot and killed the victim, who upon his death was no longer a living person known as Bruce Lee, but instead another corpse in the medical examiner's office with a case identification number. The State's argument was not improper since it referenced the evidence at trial, which showed that the victim was shot to death and that his body was assigned an identification number once it arrived at the medical examiner's office for autopsy.

¶ 84   Defendant argues that the State's comments inflamed the passions of the jury, since it repeatedly referred to the victim as Chicago's 261st homicide victim of 2011, which addressed the wider social concern of violence in the city. However, the State neither mentioned other homicides nor discussed the broader concern of violence in the city. Instead, the State referred

- 19 -

to the victim's death as taking away his name, since he became another dead body that was assigned a case number in the medical examiner's office. There is no evidence in the record that the number 261 refers to the 261st homicide in the city, and the State never claimed that it did. Further, the State's comment that the victim was "[a]nother dead body in the City of Chicago" also makes no reference to homicides or violence and is instead consistent with the argument that the victim became another dead body in the city now identified by a case number in the medical examiner's office. Defendant argues that the State's comments were more than just offhand remarks and instead were the crux of its closing argument. However, defendant only points to three such comments, none of which mention other homicides, citywide violence, or any explicit statement that the victim was the result of a larger social problem. As a result, we cannot say that the State's remarks constituted error since they did not prejudice defendant.

¶ 85    We also do not find a clear or obvious error in the State's comments concerning why Broomfield recanted his written statement. During closing arguments, the State recounted the evidence presented at trial that Broomfield's story was consistent until he testified in court:

> "Turning to that first proposition, the defendant performed the act which caused the death of [the victim]. How do you know that it was the defendant that did those actions. You know it because of *** Broomfield. You know it because in August of 2011, [Broomfield] identified the defendant as the shooter to the police officers. Then, two years later in May of 2013, he again identified the defendant as the shooter. And then he gave a handwritten statement to the police officers detailing what happened when he saw the defendant shoot [the victim]. For two years, he cooperated with police and was consistent. The one time that he changes his story is when he's up there on the witness stand face-to-face with the killer. The law recognizes that for whatever reason sometimes people change their story."

The State further told the jury that "[i]t's for you to determine whether the witness made the earlier statement, and if so, what weight should be given to that statement." The State's comments were not improper because it recounted the evidence at trial that Broomfield (1) identified defendant as the shooter to the police in 2011 and 2013, (2) provided a written statement to the police describing that he observed defendant shoot the victim, and (3) ultimately testified at trial that he never observed the shooting at all. Since Broomfield recanted his testimony in an affidavit four months before trial began, the State was not accurate when it stated that Broomfield's testimony at trial was the one time he changed his story; however, since that affidavit was not presented at trial, the State's comments when viewed as a recitation of the evidence before the jury—that the only evidence of record where Broomfield said that he did not observe defendant shoot the victim—was correct.

¶ 86    Later during closing arguments, the State added:

> "[T]his handwritten statement *** that was signed, each page, by *** Broomfield, is evidence. You can consider it as if these words were spoken out of *** Broomfield's mouth on the stand. This is evidence. No one knows why [Broomfield] said what he said two days ago. Is he—maybe because he's considered a snitch, maybe because he didn't want to be here testifying, maybe because he's scared, maybe. But, what you do know is that this statement is truth. How do you know that? You know it because the words in this statement that [Broomfield] told the police, are corroborated by other evidence in this case."

Here, the State reiterated that Broomfield changed his story in his testimony at trial and that no one knows why he recanted. The State, drawing reasonable inferences from the evidence, hypothesized why Broomfield might have recanted, arguing that "maybe" he did so because (1) he did not want others to view him as a "snitch," (2) he did not want to testify in court, or (3) he was afraid of something. The State was clear in its argument that defendant changed his story at trial for some unknown reason, and that it was for the jury to decide when if and when he was telling the truth.

¶ 87    In *People v. Smith*, 2012 IL App (1st) 102354, ¶ 62, the defendant claimed on appeal that the State improperly insinuated during closing argument, without any basis in the evidence, that a witness was afraid of the defendant when it told the jury that the witness " 'developed a sudden case of amnesia,' 'was not willing to be as forthcoming as she was when the defendant was not seated in a room with her,' and that 'sometimes people become less cooperative as time goes by.' " The *Smith* court found that the State's comments were reasonable, since its argument that the witness was putting on an act and going to great lengths to help the defendant was based on the discrepancies between the witness's trial testimony and her prior handwritten statement and grand jury testimony. *Smith*, 2012 IL App (1st) 102354, ¶ 62. Here, the State's comments were also reasonable, since the argument that Broomfield changed his story at trial for some unknown reason was based on the evidence presented at trial that he told the police multiple times within two years that he observed defendant shoot the victim, only to testify at trial that he did not observe the shooting at all.

¶ 88    Defendant cites *People v. Mullen*, 141 Ill. 2d 394, 408 (1990), *Abadia*, 328 Ill. App. 3d at 685, and *People v. Armstead*, 322 Ill. App. 3d 1, 15 (2001), in support of his argument that the State's comments during closing arguments were improper inferences, not based on record evidence, of defendant threatening Broomfield. In *Mullen*, the State suggested during closing argument "that witnesses were reluctant to testify because they were afraid that the defendant would shoot them in the back if they did so." *Mullen*, 141 Ill. 2d at 405. Specifically, the State told the jury:

> " 'And, when you consider that, remember perhaps one of the most powerful things in this case was when [the witness] got up on the stand the first time, and he said he did not want to answer.
>
> And use your common sense why he did not want to answer. The same reason that no one wanted to talk, at first; they do not want to get involved.
>
> Why don't they want to get involved? They do not want one of these (indicating) in their back. Is this going to be what runs the streets of the City of Chicago?' " (Emphasis omitted.) *Mullen*, 141 Ill. 2d at 405.

Since there was no evidence in the record that the defendant threatened or intimidated any witness, the Illinois Supreme Court affirmed the reversal of the defendant's conviction, finding that " '[p]rosecutorial comments which suggest that witnesses were afraid to testify because defendant had threatened or intimidated them, when not based upon any evidence in the record *** are highly prejudicial and inflammatory.' " *Mullen*, 141 Ill. 2d at 405 (quoting *People v. Ray*, 126 Ill. App. 3d 656, 662 (1984)).

¶ 89    In the case at bar, the State never argued that Broomfield's testimony was the product of threats or intimidation by defendant. Here, the State recounted the evidence that Broomfield cooperated with the police for years but changed his story in his testimony at trial when he was "face-to-face with the killer." The State's comment is based on the evidence in the record and

does not explicitly suggest that Broomfield changed his story because defendant had threatened him. Instead, the State continued to argue that "[n]o one knows why" Broomfield recanted at trial, and consistent with that argument, the State, drawing reasonable inferences from the evidence, posited three hypothetical reasons why he recanted, emphasizing the uncertainty of Broomfield's motives by using the word "maybe" four times in one sentence. In suggesting that Broomfield maybe did not want to be considered a "snitch," the State made no mention of defendant or any threats or intimidation by any one. When the State suggested that maybe Broomfield did not want to be in court, it did not offer any reason or explanation why. And when the State inferred that Broomfield might have been scared, it never stated who or what he could have been afraid of. Unlike *Mullen*, where the State suggested that witnesses feared the defendant shooting them in the back, the State in the case at bar never insinuated that defendant had threatened Broomfield into recanting his statement, and the State's comments were not prejudicial as a result.

¶ 90        In *Abadia*, the Illinois Appellate Court reversed the defendants' conviction and remanded for a new trial where the State argued during closing arguments that " 'justice doesn't mean you execute someone and scare off all the witnesses and you get away with it.' " *Abadia*, 328 Ill. App. 3d at 683. The defense objected to the remark, and the trial court sustained the objection and advised the jury to disregard the statement. *Abadia*, 328 Ill. App. 3d at 685. Citing *Mullen*, the *Abadia* court found that the remark was an "outrageous accusation," finding there was no evidence to support the State's accusation of witness intimidation and that the harm to the defendants could not be cured by the trial court's sustainment of the objection and subsequent curative instruction. *Abadia*, 328 Ill. App. 3d at 685. However, as stated, the State in the instant case never argued that defendant threatened or intimidated Broomfield into recanting his prior statement. As a result, the State's comments were not prejudicial.

¶ 91        In *Armstead*, the State told the jury during closing arguments that a witness was afraid to identify the defendant in his testimony because the defendant was his neighbor, arguing that the witness

> " 'had to have seen the face of the shooter. *** You know that—you know where the defendant lives. *** And you know where the victim lives. Think about it ladies and gentleman.' " *Armstead*, 322 Ill. App. 3d at 14.

The State further argued that the witness's sister was afraid to testify because the defendant's large family lived in the same building as her family. *Armstead*, 322 Ill. App. 3d at 15. The Illinois Appellate Court found that suggestion that the witness felt threatened by the defendant or his family was not based on the evidence, and it reversed the defendant's conviction, finding that this error, together with other errors, constituted reversible error due to the closeness of the evidence. *Armstead*, 322 Ill. App. 3d at 15. However, as stated, the State in the case at bar did not make a specific reference to threats or intimidation made by defendant, and the State's comments did not affect the outcome of the trial.

¶ 92        Defendant also argues that the State's "attribution of community hostility towards the police as the basis for its failure to procure additional eyewitnesses amounted to error—that assertion is entirely without evidentiary support." Specifically, defendant argues that the State suggested during closing arguments that Broomfield was the only eyewitness to testify because other witnesses refused to cooperate with the police. In support, defendant cites *People v. Coleman*, 201 Ill. App. 3d 803, 807 (1990) (finding that "all remarks made in the

closing arguments must be based upon the evidence presented or reasonable inferences drawn therefrom").

¶ 93    However, the State's remarks were not improper because they were made during rebuttal in response to the defense's closing argument. "During closing argument, the prosecutor may properly comment on the evidence presented or reasonable inferences drawn from that evidence, respond to comments made by defense counsel which clearly invite response, and comment on the credibility of witnesses." *People v. McGee*, 2015 IL App (1st) 130367, ¶ 56 (citing *People v. Rader*, 178 Ill. App. 3d 453, 466 (1988)). During closing arguments, the defense told the jury that Broomfield did not tell the police that defendant was the shooter until he was arrested for a narcotics offense on August 20, 2011. The defense argued that Broomfield identified defendant because it provided him a "get-out-of-jail free card" and that the police then released him without charges. The defense claimed that

> "[O]nce the first shot occurs, everybody who's there is going to be alert. So, all these people are playing dice with him. *** They would have seen the same thing. They got nobody. There's nobody here but *** B[r]oomfield."

¶ 94    In response, the State argued that:

> "[t]here's nothing inconsistent, especially the fact that this man was the shooter. [Broomfield] said [defendant] shot [the victim] in August of 2011. He did it again a year later in April, and again in May, and essentially he did it again through this statement a couple of days ago.
>
>     One of the other witnesses just like *** Broomfield, they don't want to be found. They don't want to be cooperative with the police."

The State's comments were not improper because they were based on the evidence and reasonable inferences therefrom. Broomfield told the police in his statement that he was playing dice with some people from the neighborhood when the shooting occurred; however, Broomfield was the only eyewitness who provided a statement to the police and testified at trial. The State's comments were in response to the defense's argument that Broomfield's story was not credible because there would have been statements and testimony from additional witnesses if he was in fact playing dice game with other people as the shooting occurred. The State responded that Broomfield was telling the truth, and that there were additional witnesses but that, for unknown reasons, they did not want to come forward. As a result, the State's remarks were not improper, since they were made in response to the defense's argument and based on reasonable inferences from the evidence at trial.

¶ 95    Finally, defendant argues that the State's comments at closing argument were improper where it told the jury, "Don't let [defendant] walk out those doors." Defendant argues that, although the remark does not amount to an outright declaration that defendant was currently in custody pending trial, "in suggesting to the jury that they have the power to prevent [defendant] from leaving, a power for which his current detention is a *condition sine qua non*, a condition precedent, it is certainly likely the jury became aware of [defendant's] contemporaneous incarceration." Defendant argues that the presumption of innocence is a "basic component of a fair trial under our system of criminal justice" (*Estelle v. Williams*, 425 U.S. 501, 503 (1976)) and that the State's remark suggested a predetermination of guilt that denied defendant a fair trial.

¶ 96     However, nothing in the State's remarks suggested that defendant was currently in custody. The State told the jury:

> "Defendant committed the ultimate act by choosing to end a person's life. Tell him that he doesn't get to decide who lives and who dies. We have a cold blooded killer sitting before you today, Ladies and Gentleman. Don't let him walk out those doors. Find him guilty of first degree murder."

The State's comments clearly do not make a reference to the defendant being in custody and instead urge the jury to find him guilty of first degree murder. The State's remark, asking the jury to not "let him walk out those doors," is plainly a request to the jury to find defendant guilty so that he may be sentenced to prison for his crime. Moreover, the defendant was dressed in civilian clothes at trial, and there is no indication in the record that he was in handcuffs or shackled in any way.

¶ 97     We cannot say that defendant has met the substantial burden of showing that the State's remarks during closing arguments were of such magnitude that they resulted in substantial prejudice to defendant and constituted a material factor in his conviction. Since the State did not commit a clear or obvious error, we cannot say that defendant was denied a fair trial, and we affirm his conviction as a result.

¶ 98     Even if the State's comments were improper and constituted error, the trial court may correct the error through proper jury instructions. "[I]mproper arguments can be corrected by proper jury instructions, which carry more weight than the arguments of counsel." *People v. Willis*, 409 Ill. App. 3d 804, 814 (2011) (citing *People v. Lawler*, 142 Ill. 2d 548, 564 (1991), and *People v. Chapman*, 262 Ill. App. 3d 439, 456 (1992)). "Moreover, any possible prejudicial impact is greatly diminished by the court's instructions that closing arguments are not evidence." *Willis*, 409 Ill. App. 3d at 814. A trial court's instructions that closing arguments are not evidence protect defendant against any prejudice caused by improper comments made during closing arguments. *People v. Quiroz*, 257 Ill. App. 3d 576, 585 (1993). It is presumed that jurors follow the instructions provided by the trial court. *People v. Taylor*, 166 Ill. 2d 414, 438 (1995).

¶ 99     Prior to closing arguments, the trial court instructed the jury that "anything the lawyers say during closing arguments is not to be considered as evidence, and anything that the lawyers say during closing arguments that conflict with your individual recollection of evidence, should be disregarded." After closing arguments, the trial court again instructed the jury that

> "[c]losing arguments are made by the attorneys to discuss the facts and circumstances in the case, and should be confined to the evidence and to reasonable inferences to be drawn from evidence.
>
> Neither opening statements nor closing arguments are evidence. Any statement or argument made by the attorneys, which is not based on the evidence, should be disregarded."

Even if the State's comments at closing argument were improper, the trial court corrected any error by instructing the jury that the State's comments were not evidence and by directing the jurors to disregard anything they heard that conflicted with the evidence presented at trial. As a result, we affirm defendant's conviction.

¶ 100                                III. Sufficiency of the Evidence

¶ 101       Next, defendant argues that we should reverse his conviction because the evidence at trial
was insufficient to prove him guilty beyond a reasonable doubt. Defendant argues that the
evidence at trial was insufficient to find defendant guilty, since it consisted "almost
exclusively" of Broomfield's prior statement, which he recanted at trial. The State responds
that the identification of a single eyewitness is sufficient to sustain a conviction and that the
jury weighed the evidence and found Broomfield's prior statement to be credible. For the
following reasons, we find that the evidence was sufficient to convict defendant beyond a
reasonable doubt.

¶ 102       Where a jury has convicted a defendant on the basis of a recanted prior inconsistent
statement, the question for the reviewing court is not whether any evidence existed to
corroborate that statement (*People v. Zizzo*, 301 Ill. App. 3d 481, 489 (1998)); rather, the
critical inquiry on review of a sufficiency of the evidence claim is whether, after reviewing all
of the evidence in the light most favorable to the prosecution, any rational trier of fact could
have found the essential elements of the crime beyond a reasonable doubt (*People v.
Cunningham*, 212 Ill. 2d 274, 278 (2004)). On review, all of the evidence is considered in the
light most favorable to the prosecution. *People v. Furby*, 138 Ill. 2d 434, 455 (1990) (citing
*People v. Collins*, 106 Ill. 2d 237, 261 (1985)). It is the jury's responsibility to determine the
witnesses' credibility and the weight to be given to their testimony, to resolve conflicts of
evidence, and to draw reasonable inferences from the evidence. A reviewing court will not
substitute its judgment for that of jury on these matters. *People v. Brooks*, 187 Ill. 2d 91, 132
(1999). A reviewing court will not overturn the fact finder's verdict unless the evidence "is so
unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of defendant's
guilt." *Wheeler*, 226 Ill. 2d at 115.

¶ 103       Defendant argues that the evidence was insufficient to convict defendant because the
State's case rested "almost exclusively" on Broomfield's statement, which he then recanted in
his testimony at trial. Defendant acknowledges that, in addition to Broomfield's statement,
Larue Bey, a local resident, testified that he heard gunshots and observed a red or orange
"Bonneville-type of car" speeding the wrong way down a one-way street 5 to 10 minutes later,
and that, although the State introduced vehicle records that indicated that defendant owned a
1998 Bonneville, the records did not state the color of the vehicle. Defendant also points out
that there was a surveillance video of a suspect leaving the scene, but claims that the video is
almost without evidentiary value. Defendant concludes that—since the State presented no
murder weapon, no confession, no evidence of a motive, and no physical evidence linking
defendant to the shooting—no rational trier of fact could find the evidence sufficient to convict
defendant of first degree murder.

¶ 104       However, after viewing the evidence in the light most favorable to the State, we cannot say
that no rational juror could have found defendant guilty beyond a reasonable doubt. The State
presented Broomfield's written statement at trial, in which he stated that, while he was playing
dice outside with some people from the neighborhood, he observed defendant, whom he had
know for five to six years, run from an alley and shoot five or six shots at the victim, who had
just exited a grocery store at Chicago and Avers Avenues.

¶ 105       The State further presented testimony from police officers who described Broomfield's
cooperation with the police and the consistency in his story. Sergeant McDonagh testified that,
on August 20, 2011, he showed Broomfield a photo array and that Broomfield identified the

photograph of defendant as the person that he observed shoot the victim as he exited the grocery store. Detective Deenihan testified that he also interviewed Broomfield later that day concerning the shooting. Detective Rodriguez testified that Broomfield was cooperative and answered questions about the shooting when he met with him on April 16, 2013. Detective Rodriguez testified that he met with Broomfield again on May 17, 2013, and that Broomfield then identified defendant as the shooter in a physical lineup. Detective Rodriguez testified that he was present as an assistant State's Attorney met with Broomfield, who then provided a statement—each page of which he signed—stating that he observed defendant shoot the victim.

¶ 106    Other evidence at trial also supported Broomfield's account of the shooting in his written statement. Willie Patterson, a delivery driver, testified that he heard up to four gunshots, and Bey testified that he heard "quite a few" gunshots. Officer Rivera testified that he processed the crime scene and recovered five bullet cartridge cases and a fired bullet next to the victim's vehicle. The parties stipulated that Dr. Cogan would testify that he performed an autopsy on the victim's body and determined that he was shot four times. A surveillance camera outside the grocery store recorded video of a red vehicle driving down the street within minutes of the shooting. Bey also testified that he observed a red or orange Bonneville-type vehicle speed the wrong way down a one-way street 5 to 10 minutes after the shooting, and he testified that the vehicle depicted in the still frames from the video appeared to be the same vehicle he observed after the shooting. Additionally, the State introduced vehicle records that showed that defendant owned a 1998 Pontiac Bonneville. We cannot say that the evidence, viewed in the light most favorable to the State, is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of defendant's guilt.

¶ 107    Furthermore, although Broomfield recanted his written statement at trial, the jury weighed all of the evidence at trial and found his prior statement to be credible. It is well established that single witness's identification of the accused is sufficient to sustain a conviction if the witness viewed the accused under circumstances permitting a positive identification. *People v. Cox*, 377 Ill. App. 3d 690, 697 (2007) (citing *People v. Slim*, 127 Ill. 2d 302, 307 (1989)). Reviewing courts have found that a recanted statement alone can be sufficient to support a conviction, even without corroborating evidence. *People v. Thomas*, 354 Ill. App. 3d 868, 878 (2004) (citing *People v. Craig*, 334 Ill. App. 3d 426, 440 (2002), *People v. Curtis*, 296 Ill. App. 3d 991, 996-97 (1998), *People v. Morrow*, 303 Ill. App. 3d 671, 677 (1999), *Zizzo*, 301 Ill. App. 3d at 489, and *People v. Wilson*, 66 Ill. 2d 346, 349 (1977)). When confronted with a recanted prior statement, "it is for the trier of fact to weigh the statement, weigh the disavowal and determine which is to be believed." *People v. Armstrong*, 2013 IL App (3d) 110388, ¶ 27. In the instant case, the jury had the opportunity to hear Broomfield's prior statement and observe his testimony recanting that statement, and it determined that Broomfield was telling the truth in his original written statement, as apparent from its verdict.

¶ 108    In assessing the reliability of a witness's identification, reviewing courts consider (1) the opportunity the witness had to view the offender at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior description of the offender, (4) the level of certainty demonstrated by the witness at the identification confrontation, and (5) the length of time between the crime and the identification confrontation. *Slim*, 127 Ill. 2d at 307-08 (citing *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972)).

¶ 109    With respect to the first factor, when assessing whether a witness had an opportunity to view the offender at the time of the offense, a reviewing court considers "whether the witness was close enough to the accused for a sufficient period of time under conditions adequate for observation." (Internal quotation marks omitted.) *People v. Tomei*, 2013 IL App (1st) 112632, ¶ 40. In this case, Broomfield claimed in his statement that he was outside playing dice when he observed the victim park his vehicle, cross the street, and walk into the store. As the victim exited the store, Broomfield observed defendant, 10 feet away from him, run from an alley towards the victim, who he shot five or six times. Broomfield also stated that, although defendant was wearing a sweatshirt with his hood up, he was able to observe defendant's face. Broomfield further stated that it was light outside and that nothing blocked his view of defendant. Weighing the evidence, it appears that Broomfield had a sufficient opportunity to view defendant during the shooting.

¶ 110    Considering the next factor, the witness's degree of attention, Broomfield provided a detailed account of the shooting. In his statement, Broomfield stated that he observed the victim turn off of Chicago Avenue onto Avers Avenue, park on the east side of the street, and exit his vehicle. He then observed the victim walk into the grocery store, exit five minutes later, and cross Avers Avenue back to his vehicle. As the victim returned to his vehicle, Broomfield observed defendant emerge from an alley on the east side of Avers Avenue, 10 feet away from him. Broomfield observed defendant wearing a sweatshirt with the hood up, and he could observe defendant's face as he ran towards the victim and shot him five or six times. Broomfield stated that the shooting scared him, so he ran to the alley on Avers Avenue south of Chicago Avenue and then ran west down an alley towards Springfield Avenue. Broomfield observed defendant flee to the alley at Avers Avenue south of Chicago Avenue and run east towards Hamlin Avenue. Broomfield stated that he waited a couple of minutes and then went back to Avers Avenue to check on the victim, who did not appear to be ok. Despite stating that he was playing dice with people at the time of the shooting, his prior statement shows that he paid enough attention to his surroundings that he was able to provide a detailed account of the shooting.

¶ 111    The third factor concerning the accuracy of the witness's prior identification is inapplicable here since Broomfield never provided a prior statement to the police.

¶ 112    Addressing the fourth factor, the level of certainty demonstrated by the witness at the identification confrontation, Broomfield never wavered in his degree of certainty that defendant was the shooter. Three months after the shooting, on August 20, 2011, Broomfield told the police that he observed defendant shoot the victim, and he then identified defendant as the shooter in a photo array. When defendant was arrested on May 17, 2013, Broomfield identified defendant in a physical lineup as the person he observed shoot the victim. The evidence shows that Broomfield was consistent throughout his identifications of defendant as the shooter.

¶ 113    As to the final factor, the length of time between the crime and the identification confrontation, the evidence shows that Broomfield did not identify defendant as the shooter until three months after the shooting. However, reviewing courts have found identifications reliable where nearly three months or more elapsed between the crime and the witness's identification. See *People v. Rodgers*, 53 Ill. 2d 207, 213-14 (1972) (affirming defendant's conviction where the witness made an identification two years after the crime); *People v.*

*Daniel*, 2014 IL App (1st) 121171, ¶ 22 (affirming defendant's conviction where the witness made an identification within three months after the crime).

¶ 114     We cannot say that the evidence, viewed in the light most favorable to the State, is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of defendant's guilt, or that no rational jury could find defendant guilty beyond a reasonable doubt. As a result, the evidence at trial was sufficient for the jury to render a guilty verdict of first degree murder, and we affirm defendant's conviction.

¶ 115                                    IV. Cumulative Error

¶ 116     Lastly, defendant claims that, even if each individual error did not amount to plain error, the cumulative effect of the errors denied him a fair trial. Defendant argues that, since the evidence in this case was close, the trial court's incorrect definition of the reasonable doubt standard of proof to the jury and the State's improper comments in closing arguments cumulatively subjected defendant to a pervasive pattern of unfair prejudice such that he is entitled to a new trial. In response, the State claims that neither the trial court nor the State committed error and that the evidence was sufficient to sustain defendant's conviction. For the following reasons, we find that defendant was not prejudiced at trial by cumulative error.

¶ 117     "[W]here errors are not individually considered sufficiently egregious for an appellate court to grant the defendant a new trial, but the errors, nevertheless, create a pervasive pattern of unfair prejudice to the defendant's case, a new trial may be granted on the ground of cumulative error." *People v. Howell*, 358 Ill. App. 3d 512, 526 (2005) (citing *Blue*, 189 Ill. 2d 99). Defendant compares the instant case to *People v. Pendleton*, 24 Ill. App. 3d 385, 397 (1974), which found that the State's reference to the pregnancy of the murder victim; the admission, without proper foundation, of a hypodermic needle allegedly found in the victim's apartment; and the admission of statements made by the defendant in violation of his *Miranda* rights were cumulative errors that deprived the defendant of a fair trial in case depending on single identification.

¶ 118     However, unlike *Pendleton*, we find no errors in the case at bar. There generally is no cumulative error where the alleged errors do not amount to reversible error on any individual issue. *People v. Doyle*, 328 Ill. App. 3d 1, 15 (2002) (citing *People v. Falconer*, 282 Ill. App. 3d 785, 793 (1996)); see *Caffey*, 205 Ill. 2d at 118 (where no error occurred at all, or any error that may have occurred did not rise to the level of plain error, the defendant was not entitled to a new trial on the basis of cumulative error). As stated, we find that the trial court did not err in its preliminary jury instructions and the State did not err in its closing arguments. Since we have found no error, there can be no cumulative error, and we affirm defendant's conviction as a result.

¶ 119                                       CONCLUSION

¶ 120     For the foregoing reasons, we affirm defendant's conviction. The trial court did not err when it instructed the jury concerning reasonable doubt, the State did not err in its comments during closing arguments, and the evidence at trial was sufficient to find defendant guilty of murder. Additionally, there was no cumulative error during trial, since we find that no error occurred at all.

¶ 121      Affirmed.